1
2
3

    UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF ILLINOIS
          EASTERN DIVISION

4
5
6

DOROTHY HOLMES, on her own      )
behalf and as the Special       )
Administrator of the Estate of  )
RONALD JOHNSON III, deceased,   )

7

                Plaintiff,       )      No. 14 CV 8536

8

        vs.                      )      Chicago, Illinois
                                 )      October 5, 2016
9

UNKNOWN JOHN DOE POLICE          )      2:30 o'clock p.m.
OFFICERS,                        )

10

                Defendants.      )

11
12

        TRANSCRIPT OF PROCEEDINGS - MOTION
    BEFORE THE HONORABLE JUDGE EDMOND E. CHANG

13
14

APPEARANCES:

15
16
17
18
19

For the Plaintiff:          ERICKSON & OPPENHEIMER, LTD.
                            MR. MICHAEL D. OPPENHEIMER
                            MS. RONAK P. MAISURIA
                            118 South Clinton Street
                            Chicago, Illinois 60661
                            312-327-3370
                            michael@eandolaw.com
                            ronak@eandolaw.com

20
21
22
23

                            JARED S. KOSOGLAD, P.C.
                            MR. JARED SAMUEL KOSOGLAD
                            223 West Jackson Boulevard
                            Suite 200
                            Chicago, Illinois  60661
                            312-513-6000
                            jared@jaredlaw.com

24
25

| | | |
|---|---|---|
| 1 | For the Defendant: | CITY OF CHICAGO, DEPTARTMENT OF LAW |
| 2 | | MR. BRET ANTHONY KABACINSKI |
| | | MS. CAROLINE JANE FRONCZAK |
| 3 | | 30 North LaSalle Street |
| | | Chicago, Illinois 60602 |
| 4 | | 312-742-6408 |
| | | christopherwallace@cityofchicago. |
| 5 | | org |
| | | kevin.gallardo@cityofchicago.org |
| 6 | | |
| 7 | | BORKAN & SCAHILL, LTD. |
| | | BY:  MR. TIMOTHY P. SCAHILL |
| 8 | | Two First National Plaza |
| | | 20 South Clark Street, Suite 1700 |
| 9 | | Chicago, Illinois  60603 |
| | | (312) 580-1030 |
| 10 | | tscahill@borkanscahill.com |
| 11 | | |
| 12 | For the Respondent: | FOLEY & LARDNER LLP |
| | | MR. PATRICK JOSEPH McMAHON |
| 13 | | MS. LISA MARIE NOLLER |
| | | 321 North Clark Street |
| 14 | | Suite 2800 |
| | | Chicago, Illinois  60654 |
| 15 | | (312) 832-4576 |
| | | pmcmahon@foley.com |
| 16 | | lnoller@foley.com |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | Court Reporter: | FEDERAL OFFICIAL COURT REPORTER |
| | | MS. KRISTA BURGESON |
| 24 | | 219 South Dearborn Street |
| | | Chicago, Illinois 60604 |
| 25 | | 312-435-5567 |
| | | krista_burgeson@ilnd.uscourts.gov |

1    (The following proceedings were had in open court:)

2    THE COURTROOM DEPUTY:  14 C 8536, Holmes versus

3 Officer Hernandez.

4    MR. KOSOGLAD:  Good morning, Your Honor.  Jared

5 Kosoglad for the plaintiffs.

6    MS. MAISURIA:  Good morning, Your Honor.  Ronak

7 Maisuria for the plaintiff.

8    MR. MCMAHON:  Good morning, Your Honor.  Patrick

9 McMahon for the respondent.

10    MR. KABACINSKI:  Good morning, Your Honor.  Bret

11 Kabacinski for the City of Chicago.

12    MS. FRONCZAK:  Caroline Fronczak on behalf of the

13 City of Chicago.

14    MR. SCAHILL:  Good afternoon, Your Honor.  Timothy

15 Scahill on behalf of Defendant Hernandez.

16    MS. NOLLER:  Good afternoon, Your Honor.  Lisa Noller

17 for respondent.

18    THE COURT:  Okay.  Good afternoon.

19    All right.  So I accelerated on the hearing on the

20 motion to compel IPRA because I have a few questions I want to

21 follow up on, and then we will hold a status on the case at

22 large.

23    So in trying to figure out just how burdensome it

24 would be to produce the drafts of the summary reports, my

25 first question is this:

02:33:48   1            In the initial response to the motion, IPRA stated

02:33:51   2    that there were some instances in which the draft summary

02:33:56   3    report was the only evidence of a nonconcurrence, right?  And

02:34:01   4    so I wager what that means is that for some reason or another,

02:34:05   5    there was not a formal memo which documented the

02:34:09   6    nonconcurrence.

02:34:10   7            Is that right?

02:34:12   8            MR. McMAHON:  Yes, Your Honor.

02:34:15   9            THE COURT:  And about how many -- how many instances

02:34:21  10    did that happen, where you have produced a draft summary

02:34:26  11    report because there was no formal memo?

02:34:28  12            MR. MCMAHON:  I think there were about 13, and I

02:34:31  13    believe we produced those to plaintiff.

02:34:38  14            THE COURT:  So my question, and this may get to the

02:34:41  15    burden issue, is how did you determine that in those 13 files,

02:34:47  16    there was a nonconcurrence but there was no formal memo?

02:34:53  17            MR. MCMAHON:  Well, Your Honor, from my understanding

02:34:55  18    in speaking with our client, they had to go back to physical

02:34:59  19    files and were flipping through some of these different draft

02:35:02  20    summary reports, and if they noticed that there was a

02:35:05  21    nonconcurrence within these drafts, that was the only

02:35:07  22    evidence, there was no final form or memo.  They separated

02:35:10  23    that out, and then as part of plaintiff's discovery request,

02:35:13  24    produced those in response.

02:35:18  25            THE COURT:  So that was a review of some paper file

02:35:29  1    that represents the official file of that investigation?

02:35:33  2          MR. MCMAHON:  Yes, Your Honor.

02:35:34  3          THE COURT:  So that did not involve looking in like

02:35:42  4    file desk drawers of investigators or looking at either a

02:35:49  5    network or a local hard drive?

02:35:52  6          MR. MCMAHON:  From my understanding, that is correct,

02:35:54  7    Your Honor.

02:35:55  8          THE COURT:  And was that the number of files -- the

02:36:00  9    number of files reviewed there, was that the 212, or was that

02:36:04  10   the larger number, like 300 or so?

02:36:06  11         MR. MCMAHON:  I believe it was --

02:36:08  12         Do we have a clear answer on that?

02:36:10  13         MS. NOLLER:  Our understanding is there are 212 that

02:36:13  14   have been determined to be -- to include draft summary

02:36:18  15   reports, just by the nature of the file, but it's not 212

02:36:23  16   documents, right, because of each version of the back and

02:36:26  17   forth deliberation in and among the investigators is a number

02:36:33  18   of additional reports.

02:36:34  19         THE COURT:  Right.

02:36:35  20         What I mean is how many separate investigations does

02:36:39  21   that represent in the 212?

02:36:44  22         MR. MCMAHON:  212 separate investigations.

02:36:49  23         MS. NOLLER:  That is our understanding.

02:36:55  24         THE COURT:  Okay.  So there is some irony here.

02:37:05  25         The counsel who -- and this is before you were

1   brought on; is that right?

2           MR. MCMAHON:  Yes, Your Honor.

3           THE COURT:  So the prior IPRA counsel actually went

4   through approximately 212 paper investigation files and pulled

5   out instances where the draft summary reports, or one of them,

6   would be evidence of a nonconcurrence.  And so, in theory,

7   they could have just set out the draft summary reports in

8   terms of the burden, just segregated them already, right, or

9   put a Post-it on them and flagged it?

10          MR. MCMAHON:  I don't think that that is the case,

11  Your Honor.

12          From my understanding, those were paper files, and

13  there are several -- so these drafts and reports may or may

14  not exist in paper form like that.  A lot of times these are

15  via Word documents going back and forth between investigators,

16  which may track changes made, so not necessarily like

17  handwriting on them and --

18          THE COURT:  No, I understand that.  Maybe I was not

19  precise in my question.

20          What I mean to say is IPRA counsel went through 212

21  paper -- 212 investigative files in paper format looking for

22  the draft summary reports, right?

23          MS. NOLLER:  No.

24          I believe they looked for nonconcurrences.

25          THE COURT:  But how would they determine that there

02:38:47  1  was a nonconcurrence that is not formally documented without
02:38:51  2  reading the draft summaries?
02:38:53  3         MS. NOLLER:  So there is something in the paper --
02:38:56  4  there was supposed to be something in the paper file that is a
02:38:59  5  final report.  When there is a final report with all
02:39:04  6  signatures, that would be in the paper file.  The prior draft
02:39:07  7  summary reports and the back and forth doesn't necessarily
02:39:11  8  make it into the paper file.  That resides on the individual's
02:39:15  9  desktop or mainframe or all sorts of other relations.
02:39:19  10         So in those instances, they would look for the
02:39:22  11  nonconcurrence.  Where they found no final report, the version
02:39:29  12  of report in there is essentially a final report, to the
02:39:34  13  extent it exists.
02:39:39  14         THE COURT:  Okay.  So there are instances in which
02:39:44  15  there is no final report?
02:39:48  16         MS. NOLLER:  Those 13 cases, yes.
02:39:51  17         MR. MCMAHON:  Right.
02:39:52  18         THE COURT:  So those 13 instances --
02:40:04  19         So how do you know that that was a nonconcurrent
02:40:08  20  situation?
02:40:09  21         MS. NOLLER:  There is a nonconcurrent document that
02:40:14  22  is in the file.  So the paper file includes nonconcurrent.
02:40:23  23         Theoretically, Judge, there could be other files
02:40:26  24  where there is nonconcurrence that was not stored in a file,
02:40:33  25  we don't think so, but we can't say for certain that that is

02:40:37  1    the case, because of the way that the IT system is set up and
02:40:42  2    the way people store their files.
02:41:52  3            THE COURT:  Okay.  So I think I misinterpreted.
02:41:55  4            So the response on Page 5 says -- yes, Page 5, docket
02:42:02  5    entry 179:  Plaintiff's purported need for all draft summary
02:42:15  6    reports for each of the hundreds of investigation files
02:42:18  7    requested is to discover instances in which a supervisor or
02:42:24  8    administrator has ordered an investigator to change his or her
02:42:27  9    recommended finding.
02:42:30  10           To address this stated need, and without waiver of
02:42:33  11   its privilege, IPRA agreed as a compromise to produce any
02:42:39  12   draft summary report that is the only evidence of a
02:42:45  13   nonconcurrence in a closed investigation.
02:42:51  14           So I interpret that to mean -- and this is along the
02:42:54  15   lines of the questioning that opened up the hearing -- that
02:42:57  16   there were some instances in which the investigative file did
02:43:02  17   not have a formal memo that said, there is a nonconcurrence in
02:43:13  18   this investigation, because the next sentence, or the last
02:43:19  19   sentence in that paragraph says:  Although plaintiff will also
02:43:23  20   be receiving the formal nonconcurrence memorandums, if any, as
02:43:29  21   part of the production of the closed investigation files.
02:43:35  22           So I took that to mean that there were -- that there
02:43:39  23   is always supposed to be some kind of formal nonconcurrence
02:43:43  24   memorandum, which is not the same as the final report.
02:43:46  25           Okay?

02:43:47 1    Is there supposed to be a formal nonconcurrence
02:43:50 2 memorandum that is separate and apart from just the final
02:43:53 3 report?
02:43:54 4    MR. MCMAHON:  I believe those are separate.  I
02:43:56 5 believe there is a memo in the documents of nonconcurrence,
02:43:59 6 and then there's also the final report.
02:44:01 7    THE COURT:  That is published.
02:44:02 8    MR. MCMAHON:  Right.
02:44:04 9    MS. NOLLER:  Where it exists, right.
02:44:07 10    MR. MCMAHON:  Right.
02:44:07 11    THE COURT:  So I interpret this to mean that there
02:44:11 12 were instances in which there was not a formal nonconcurrence
02:44:18 13 memorandum.
02:44:20 14    MR. MCMAHON:  Right.
02:44:20 15    THE COURT:  And that the draft summary shows the
02:44:24 16 nonconcurrence.  And so you turned those over, right?
02:44:28 17    MR. MCMAHON:  If that was the only evidence that
02:44:31 18 there was no formal memo and there was a nonconcurrence that
02:44:35 19 was evident from the draft summary reports, we would enter
02:44:40 20 that single draft summary report for that specific case.
02:44:44 21    THE COURT:  So I don't understand how the absence of
02:44:53 22 a final report, okay, not the formal nonconcurrence
02:44:58 23 memorandum, the absence of a final report, how does that
02:45:01 24 factor into the 13 instances?
02:45:03 25    MR. MCMAHON:  The absence of a final report?

02:45:05  1          THE COURT:  Right.

02:45:07  2          Or does it not factor into the 13 instances?

02:45:13  3          MR. McMAHON:  There is a final report.

02:45:13  4          MS. NOLLER:  No.  In those where there was not a

02:45:16  5    final report, but we produced, frankly, the next best thing in

02:45:21  6    an effort that was conciliatory, because there were instances

02:45:21  7    of nonconcurrence, and we understood that that was what

02:45:21  8    plaintiff was interested in.

02:45:27  9          THE COURT:  Are you using the term "final report" to

02:45:30  10   signify something different form the formal nonconcurrence

02:45:30  11   memorandum?

02:45:30  12          Please do.

02:45:39  13          I'm trying to figure out -- it doesn't seem -- based

02:45:39  14   on what is written in that response, it didn't seem that

02:45:43  15   whether or not there is a final report, that report that gets

02:45:48  16   published, has anything to do with these 13 instances of

02:45:52  17   production.

02:45:53  18          MS. NOLLER:  So it is my understanding those are two

02:45:56  19   different documents, but Your Honor, we can clarify that.  I

02:45:59  20   see why you are asking the question.

02:46:02  21          THE COURT:  Because if they are two separate

02:46:04  22   documents -- and so the final report has nothing to do with

02:46:07  23   this -- with the 13 instances.  What I am trying to get at is

02:46:12  24   how did you -- not you, directly, but how did prior IPRA

02:46:19  25   counsel figure out that, here are 13 instances where there was

02:46:25  1   a nonconcurrence, but there was no formal nonconcurrence memo?

02:46:30  2           MR. MCMAHON:  Right.

02:46:31  3           THE COURT:  Okay.

02:46:33  4           And so if they did that by -- and again, this goes

02:46:37  5   back to the burden question -- going through, you know, these

02:46:41  6   212 files and reading the draft summary reports, right, in

02:46:45  7   order to figure out -- I mean, I suppose the instances where

02:46:51  8   there was a formal nonconcurrence memo, maybe they skipped

02:46:55  9   that file, like they were going to produce that; but,

02:46:58  10  otherwise, even if a file has the final report, you know, the

02:47:04  11  report that gets published, and no formal nonconcurrence

02:47:10  12  memorandum, it sounds like what they did was they read through

02:47:13  13  the paper copies of the draft summary reports in the 212

02:47:17  14  files.  And if they already had done that, then they should

02:47:22  15  have just slapped a Post-it or something on them, the draft

02:47:25  16  summary reports, so that if they needed to be copied at some

02:47:29  17  point, then no additional burden there.

02:47:33  18          Okay.  That is separate, I agree, from hard drives

02:47:37  19  and network drives and all of that, but I -- I would wager

02:47:42  20  that the plaintiffs would want at least the paper copies, you

02:47:45  21  know, even if it would be really difficult to retrieve

02:47:48  22  electronic copies.

02:47:50  23          Right?

02:47:50  24          MR. KOSOGLAD:  Yes, Judge.

02:47:52  25          THE COURT:  Okay.  Do you have any understanding from

| | | |
|---|---|---|
| 02:47:54 | 1 | talking with the prior IPRA counsel about the 13 instances and |
| 02:47:58 | 2 | how that was generated? |
| 02:47:59 | 3 | MR. KOSOGLAD:  No. |
| 02:48:09 | 4 | THE COURT:  All right. |
| 02:48:10 | 5 | Now, with regard to potential electronic versions. |
| 02:48:14 | 6 | So how many IPRA investigators were there during this |
| 02:48:21 | 7 | five-year time period, roughly? |
| 02:48:24 | 8 | MR. MCMAHON:  I don't know the total number that were |
| 02:48:28 | 9 | involved over that time period.  I know on each investigation, |
| 02:48:32 | 10 | typically, there were two to three.  I am not sure what kind |
| 02:48:36 | 11 | of turnover they had over that five-year period.  But each |
| 02:48:40 | 12 | investigation -- |
| 02:48:41 | 13 | THE COURT:  Like currently, how many are there? |
| 02:48:44 | 14 | MR. MCMAHON:  5 or 6? |
| 02:48:46 | 15 | MS. NOLLER:  3 or 4 at the initial level, then |
| 02:48:50 | 16 | there's 2 or 3 supervisors, and then there's a final person, |
| 02:48:52 | 17 | and then the head of the agency. |
| 02:48:56 | 18 | So they each have drafts and deliberations going back |
| 02:48:59 | 19 | and forth. |
| 02:49:00 | 20 | THE COURT:  Right.  So at the initial -- the 3 or 4 |
| 02:49:05 | 21 | investigators at the first level, they are -- well, are they |
| 02:49:09 | 22 | typically the ones who generate the first drafts? |
| 02:49:12 | 23 | MR. MCMAHON:  Yes.  Yes, Your Honor. |
| 02:49:20 | 24 | THE COURT:  Yeah, that is a smaller number than I |
| 02:49:22 | 25 | thought.  That is not a whole lot of investigators, even if |

02:49:28   1   there is turnover in the five-year period.

02:49:31   2         MR. MCMAHON:  Well, Your Honor, I would say that

02:49:33   3   although the investigator number is small, the number of

02:49:37   4   drafts that exist in any one investigation would be

02:49:41   5   significantly higher than just the number of investigators, as

02:49:44   6   far as number of drafts that go back and forth.

02:49:47   7         I don't know what kind of naming schemes they might

02:49:49   8   be using on these files, as far as they're easy to locate

02:49:53   9   looking through a hard drive.  To the extent that they even

02:49:57  10   exist in electronic form, some investigators, I imagine, as

02:50:00  11   you saw, would print these off and write notes in the margin

02:50:04  12   and give them back, maybe, and then more exchanges would

02:50:07  13   occur.

02:50:08  14         So as far as the number of investigators, Your Honor,

02:50:11  15   you are correct, in that there may be only three, and there's

02:50:14  16   only 8 to 10 that are in the office, but as it correlates to

02:50:19  17   the number of drafts that exist in any one investigation, that

02:50:22  18   number could be significantly higher.

02:50:26  19         THE COURT:  Okay.  When you are talking about the

02:50:28  20   "printed copies," those would appear in the paper file?

02:50:32  21         MR. MCMAHON:  Ideally, Your Honor.  However, from my

02:50:35  22   understanding, and in speaking with the client, how these

02:50:40  23   drafts go back and forth -- it is not a perfect system, we

02:50:44  24   will say that.

02:50:45  25         THE COURT:  Okay.

| | | |
|---|---|---|
| 02:50:47 | 1 | Assume for the moment that with regard to paper |
| 02:50:51 | 2 | copies, if the search is limited to the paper files that |
| 02:50:56 | 3 | represent the official investigative file, which it -- which |
| 02:51:01 | 4 | prior counsel might have already gone through, so just set |
| 02:51:05 | 5 | that aside for the moment, and indeed, that may end up, if I |
| 02:51:10 | 6 | decide -- there is other balancing I have to do here, but just |
| 02:51:16 | 7 | on the issue of burden, if that is the limit of your paper |
| 02:51:19 | 8 | copy search, right, it may already have been, in essence, |
| 02:51:23 | 9 | done, so I might not require you to look under the radiator |
| 02:51:32 | 10 | and in closets and things like that.  Okay?  Because all five |
| 02:51:37 | 11 | years' worth are still on site wherever IPRA's office is, |
| 02:51:43 | 12 | right? |
| 02:51:43 | 13 | MR. McMAHON:  I can't represent that every draft |
| 02:51:45 | 14 | summary report -- |
| 02:51:46 | 15 | THE COURT:  No, no. |
| 02:51:47 | 16 | Just the official investigative file. |
| 02:51:50 | 17 | MR. MCMAHON:  Yes. |
| 02:51:51 | 18 | THE COURT:  There is some retrieval issue. |
| 02:51:54 | 19 | MR. MCMAHON:  Yes. |
| 02:51:54 | 20 | THE COURT:  Okay. |
| 02:51:55 | 21 | Back to the electronic version.  So have you actually |
| 02:52:09 | 22 | conferred with investigators to ask them whether they stored |
| 02:52:16 | 23 | electronic versions, and if so, if they had naming conventions |
| 02:52:26 | 24 | and file folders with the investigation numbers and so on? |
| 02:52:30 | 25 | MR. MCMAHON:  The extent of our conversation has been |

02:52:34  1   primarily with IPRA's general counsel and his understanding
02:52:38  2   with the process.
02:52:39  3         She -- the documents are saved typically locally on
02:52:46  4   their machines.  From my understanding, they don't share --
02:52:51  5   have a shared drive that they necessarily keep a living
02:52:52  6   document on.
02:52:53  7         And to the earlier point, as far as any turnover,
02:52:56  8   those machines, those old machines, may be somewhere else now
02:53:01  9   that have drafts saved on them and are no longer in use.  To
02:53:05 10   the extent that IPRA even has control over them, I am not
02:53:09 11   sure.
02:53:09 12         But these draft summary reports are not necessarily
02:53:12 13   -- they are not included in the final investigatory file, so
02:53:18 14   these drafts weren't --
02:53:18 15         THE COURT:  Okay.
02:53:19 16         MR. MCMAHON:  Like I mentioned before, it is not a
02:53:20 17   perfect system.
02:53:21 18         THE COURT:  All right.
02:53:22 19         So the electronic version, did they -- did IPRA have
02:53:35 20   a template that the investigators used to start out each
02:53:38 21   draft?
02:53:39 22         MR. McMAHON:  I do not know the answer to that
02:53:41 23   question, Your Honor.
02:53:42 24         THE COURT:  And this is a draft of what becomes the
02:53:44 25   final report, right?

02:53:46   1          MR. MCMAHON:  Yes.

02:53:46   2          THE COURT:  And so the final report, would it have a

02:54:01   3    particular title or key words that would not otherwise appear

02:54:11   4    typically in other documents?

02:54:13   5          MR. MCMAHON:  Do you mean as it is saved in the

02:54:15   6    computer, Your Honor?  Or -- when you say "title," what --

02:54:21   7          THE COURT:  If it has some kind of fancy title, like

02:54:24   8    IPRA final report of investigation.

02:54:27   9          MR. MCMAHON:  Dot doc or something?

02:54:32  10          THE COURT:  No.

02:54:37  11          There is software that can search for any string of

02:54:41  12    words.

02:54:41  13          MR. McMAHON:  Right.

02:54:42  14          THE COURT:  Whether it is with a file name or

02:54:44  15    content.

02:54:45  16          MR. MCMAHON:  Okay.

02:54:45  17          THE COURT:  So I am -- is there --

02:54:49  18          Well, you have seen some of these final reports,

02:54:53  19    right?  What do you think?

02:54:54  20          If you were able to give them a search term, is there

02:54:58  21    a string of words that would not call up a whole bunch of

02:55:01  22    other irrelevant documents that would cause additional review

02:55:07  23    that they would have to do?

02:55:08  24          MR. KOSOGLAD:  I think so.

02:55:09  25          I mean, working with them, you can imagine things

02:55:12  1    like summary digest report, draft summary report, would be how

02:55:15  2    they would be saved.  That is pending on talking to the

02:55:21  3    investigators, and --

02:55:22  4           THE COURT:  I am not talking about the file name,

02:55:25  5    because if they did not have a file name convention, then

02:55:27  6    that's not going to work well.

02:55:28  7           But I mean -- and maybe IPRA does not have this on

02:55:32  8    their computers, and we can talk about costs and if the

02:55:36  9    plaintiff has to share some of the cost and so on.  But there

02:55:40  10   are ways to search contents of files, be they PDF or word

02:55:46  11   processing documents; the content, not the file names.

02:55:51  12          MR. KOSOGLAD:  I understand.

02:55:52  13          THE COURT:  So what do you think?

02:55:53  14          MR. KOSOGLAD:  Yes, I think that we could -- I mean,

02:55:56  15   I haven't not thought of that before, but looking at the

02:55:58  16   various files, I am sure there are text strings that you could

02:56:01  17   look at that follow each and every file, or would follow most

02:56:05  18   of the files, because even though there may not be an actual

02:56:09  19   template that they use, they do follow the same format.

02:56:13  20          So there ought to be ways of searching that would

02:56:17  21   retrieve only reports or draft reports based on text strings.

02:56:23  22   I wouldn't have an example that I could give you right now,

02:56:25  23   because I haven't compared the files in that level of detail,

02:56:29  24   but I am sure that we could come up with something.

02:56:31  25          MS. NOLLER:  This exercise was just done in another

02:56:34　1　case for Judge Gotschall, but the vendor that the City uses
02:56:39　2　got the number of individual drives that needed to be imaged,
02:56:44　3　it got a quote for 5,000 to $9,000 per drive, and that is just
02:56:50　4　for a forensic to collect the hard drives.  Running the search
02:56:54　5　terms, then it depends on the number of search terms and the
02:56:59　6　number of documents in that file.
02:57:00　7　　　　　That also was exclusive of -- that was just reports,
02:57:04　8　so PDF and Word documents.
02:57:12　9　　　　　THE COURT:  When you say "reports," does that include
02:57:15　10　interview witness reports and that sort of thing?
02:57:18　11　　　　　MS. NOLLER:  That's a good question.  We didn't ask
02:57:20　12　that question.
02:57:20　13　　　　　It was meant to be narrower and try and drive the
02:57:25　14　cost down and --
02:57:27　15　　　　　THE COURT:  All right.
02:57:28　16　　　　　So in another case, IPRA investigator computers have
02:57:32　17　been imaged?
02:57:35　18　　　　　MS. NOLLER:  No, there was just a quote for the
02:57:37　19　imaging.
02:57:38　20　　　　　THE COURT:  Oh, okay.
02:57:39　21　　　　　MS. NOLLER:  The motion is now held in abeyance, and
02:57:44　22　I don't believe it will be granted.  They were asked to do the
02:57:47　23　exercise.
02:57:48　24　　　　　THE COURT:  To just get a cost estimate?
02:57:50　25　　　　　MS. NOLLER:  Right.

02:57:51 1          But I actually agree there probably are search terms.

02:57:55 2   Like any string of search terms, some are going to be better

02:57:59 3   than others.  And if you have to OCR the files, that adds an

02:58:03 4   additional layer of cost for the Word documents, but for the

02:58:06 5   PDF -- I mean, it can be done.  It is just expensive and it

02:58:13 6   takes a long time.

02:58:14 7          THE COURT:  All right.

02:58:17 8          So, first, check with IPRA, their IT Department,

02:58:22 9   whether they already have installed on either computers -- and

02:58:27 10  if it is not the computers that you would need -- if they have

02:58:31 11  a license to do this where this software would be able to

02:58:36 12  search already the content of files without having to re-image

02:58:41 13  them.

02:58:44 14         I can tell you on the Court's computers, I can run a

02:58:48 15  search across PDFs, WordPerfect documents, MS Word, all sorts

02:58:53 16  of files, for content.  And now, you know, that may be

02:58:59 17  something that IPRA's IT exceeds -- it might exceed IPRA's IT

02:59:07 18  capacity, but let's find out.  Because if it is possible, then

02:59:11 19  that kind of key word searching would then be the next point

02:59:19 20  of discussion in terms of alleviating the burden of looking

02:59:21 21  through what sounds like a haphazard file naming convention,

02:59:27 22  and even file folders of the investigations.

02:59:33 23         Okay.  And so just to help me understand this

02:59:36 24  further, when you say in the supplemental response, that

02:59:42 25  sometimes comments are made digitally, does that mean that a

| 02:59:50 | 1 | reviewer sent back an email, or there was -- although you said |
| 03:00:00 | 2 | this was no shared drive, there was some kind of document on |
| 03:00:03 | 3 | some accessible drive that they could just write onto |
| 03:00:11 | 4 | directly? |
| 03:00:11 | 5 | MR. MCMAHON:  Your Honor, in that instance, for |
| 03:00:13 | 6 | digital comments, I just meant along the lines of track |
| 03:00:17 | 7 | changes, digitally, rather than writing pen and paper in the |
| 03:00:21 | 8 | margin.  So a document that is getting pushed back and forth |
| 03:00:27 | 9 | using track changes. |
| 03:00:28 | 10 | THE COURT:  So being pushed back and forth via email? |
| 03:00:32 | 11 | MR. MCMAHON:  Yes, sir. |
| 03:00:33 | 12 | MS. NOLLER:  And sometimes just the cover of the |
| 03:00:35 | 13 | emails reflect those as well.  And that 5 to $9,000 estimate |
| 03:00:46 | 14 | did not include searching that, I believe. |
| 03:00:51 | 15 | MR. KOSOGLAD:  I'm sorry. |
| 03:00:53 | 16 | THE COURT:  Okay. |
| 03:00:54 | 17 | MR. KOSOGLAD:  May I ask a question?  It sounds to me |
| 03:00:58 | 18 | that if they are sharing the drafts amongst each other via |
| 03:01:02 | 19 | email, most email programs provide for the ability to do |
| 03:01:07 | 20 | searches.  So it wouldn't even be that complicated to do an |
| 03:01:10 | 21 | email search for the drafts, instead of looking at the actual |
| 03:01:14 | 22 | hard drives for locally-saved files, if they are on a server |
| 03:01:17 | 23 | somewhere. |
| 03:01:18 | 24 | THE COURT:  That does assume that the email has |
| 03:01:20 | 25 | enough content that is reliably going to be picked up by a |

03:01:25  1  search.  Like it could easily be, here is what I think about

03:01:32  2  X, X investigation, without something as reliable as, digest

03:01:37  3  summary report, or whatever the string of words are.

03:01:40  4          MR. KOSOGLAD:  I guess if we used that same string to

03:01:43  5  do a search through emails, we would still get the reports.

03:01:46  6  We might get some extra stuff that could be excluded, but --

03:01:49  7          THE COURT:  You are saying that if you run the search

03:01:52  8  through the attachments to the emails?

03:01:54  9          MR. KOSOGLAD:  Right.  Right.

03:01:56  10          I mean, my -- right.  If that is the method they are

03:02:00  11  sharing amongst each other, then it should actually be a very

03:02:04  12  simple process in doing that.

03:02:05  13          THE COURT:  And have you ever hired a vendor to do

03:02:08  14  that?

03:02:08  15          MR. KOSOGLAD:  No.

03:02:11  16          MS. NOLLER:  So since we are talking about burden,

03:02:13  17  one other point, Your Honor, is that there are, separate and

03:02:18  18  apart from deliberative process privilege, communications in

03:02:21  19  the track change comments from time to time when attorneys are

03:02:27  20  weighing in.  And so it is not -- every single one of them

03:02:31  21  would have to be reviewed, which would be the responsible

03:02:34  22  thing to do anyway, of course, but it is not as simple that if

03:02:38  23  you find the deliberate process privilege doesn't count, we

03:02:42  24  still have to do review for attorney/client and work product.

03:02:45  25          THE COURT:  Right.

03:02:47  1          And I think part of the issue here on burden is --

03:02:56  2   right now it not very concrete in my mind as to how burdensome

03:03:04  3   this is.  That is why I am asking these questions.

03:03:06  4          It may be that on the paper copy, that the burden is

03:03:10  5   not very significant, because it has already been shouldered,

03:03:14  6   or should have already been shouldered.

03:03:18  7          On the electronic versions, that is where it is more

03:03:28  8   amorphous right now, and it may that something like taking a

03:03:31  9   sampling might be the first step to try to figure out how

03:03:37  10  burdensome it would be.

03:03:38  11         For example, you know, you pick one investigator for

03:03:42  12  one period of time and then see what you get out of that

03:03:46  13  search, and if each investigative file has a dozen drafts,

03:03:53  14  then I can see the burden being significant, but if it shows

03:04:01  15  one or two drafts, then that is a very different burden.

03:04:09  16         Okay.  Here is how we will move forward right now,

03:04:12  17  and this is all assuming you want to pursue this?

03:04:16  18         MR. KOSOGLAD:  Yes, Judge.

03:04:18  19         THE COURT:  I keep saying it every status, that I

03:04:21  20  warned you that this Monell discovery would keep pushing out

03:04:25  21  discovery.  Okay.

03:04:28  22         So the -- I am not sure what to call it now.  So the

03:04:39  23  second supplemental response from IPRA on the -- on how the

03:04:48  24  paper copy search was done.  Okay?  And that shouldn't take

03:04:55  25  too long.  You are just going to talk to whoever the prior

03:04:58  1   counsel was.

03:05:04  2        So file that description by October 11.  And you

03:05:22  3   understand what I am getting at, right?  Like, how did the 13

03:05:25  4   instances get generated, and then did that include a review of

03:05:31  5   each draft summary report in those paper files.

03:05:35  6        MR. MCMAHON:  Yes, Your Honor.

03:05:35  7        THE COURT:  And then also just what the number of

03:05:39  8   paper files they looked at, investigations, separate, I am not

03:05:43  9   talking about each document, but how many, just to confirm

03:05:46  10  that it was either the 212, or whatever the other number was.

03:05:50  11       MR. MCMAHON:  Yes, Your Honor.

03:05:52  12       THE COURT:  And -- Okay.

03:06:14  13       And then the -- with regard to the electronic

03:06:18  14  versions, let's get an answer from the IT Department about the

03:06:23  15  capability of doing text searching on the local drives and

03:06:36  16  confirm with the -- so some of the current investigators have

03:06:46  17  been with IPRA before October 2014?

03:06:49  18       MR. MCMAHON:  I believe they are, Your Honor, but I

03:06:51  19  would have to check to make sure.

03:06:53  20       THE COURT:  Okay.

03:06:58  21       Confirm with any of the investigators who are

03:07:01  22  currently there, and were there before October 12, 2014, that

03:07:25  23  they did not have a file naming convention for their draft

03:07:30  24  summary reports, and where they would save electronic versions

03:07:42  25  rather than filtering this through the general counsel.  And I

03:07:46  1   say this not to intrude into how you deal with your client,

03:07:50  2   but I -- I am still trying to do this somewhat informally this

03:07:55  3   way, as opposed to having some kind of 30(b)(6) set of

03:07:59  4   depositions just on how records were kept.

03:08:04  5          So have as specific answers as possible and who they

03:08:07  6   are, okay, who you talked to.  All right?

03:08:11  7          MR. MCMAHON:  Yes, Your Honor.

03:08:12  8          THE COURT:  All right.

03:08:26  9          See if you can do this by October 11 also.

03:08:29  10         MR. MCMAHON:  In the same response?

03:08:31  11         THE COURT:  Yes, in the same response.

03:08:38  12         And then we will reconvene after that.

03:08:41  13         But let me let the plaintiffs pipe in on anything you

03:08:44  14  want to at this point.

03:08:46  15         MR. KOSOGLAD:  The only thing that I would add is,

03:08:50  16  and I might be wrong, we will investigate about searching the

03:08:54  17  email system, but it would seem like that it might actually be

03:08:58  18  a lot easier than searching local drives on computers.  If you

03:09:02  19  can punch in an investigation number and retrieve emails

03:09:07  20  related to that investigation from the server, and then

03:09:11  21  identify the reports, it doesn't seem like -- again, if there

03:09:15  22  are 12 drafts sent among 7 people and this produces thousands

03:09:19  23  of emails, or something like that, then it is not going to be

03:09:22  24  -- it is going to be too burdensome; but if it comes back with

03:09:26  25  something that is more simple, and perhaps doing it through a

03:09:29  1   sampling, as the Court suggested, to test it and see if it

03:09:33  2   would work, I was wondering if they couldn't, when they talk

03:09:37  3   to the IT Department, ask about the feasibility of conducting

03:09:40  4   an email search like that.

03:09:42  5          THE COURT:  Yes, why don't you make that part of the

03:09:45  6   conversation too.  Search both the emails themselves and the

03:09:48  7   attachments to emails.

03:09:49  8          MS. NOLLER:  So, Your Honor, since we are talking

03:09:52  9   about burden, can I interject something that may make a lot of

03:09:55  10  this -- not moot, but less important?

03:10:00  11         THE COURT:  All right.

03:10:01  12         MS. NOLLER:  Given the relevance and purpose that

03:10:04  13  plaintiffs have stated for why they want these, did somebody

03:10:08  14  -- were investigators directed to change or delete documents,

03:10:12  15  if there are let's call it 7 or 8 investigators, we will

03:10:19  16  obviously get that number for you during that five-year period

03:10:23  17  of time, deposing those investigators, and we would produce

03:10:26  18  them for deposition, to say then, sir, at any point were you

03:10:30  19  asked to change or delete your file; and if the answer is yes,

03:10:36  20  in which instances, who directed you, what file, what was

03:10:40  21  changed, that is a far more efficient process, because it is

03:10:43  22  not just asking City of Chicago IT Department, Judge, it is

03:10:47  23  asking the vendor who was retained by the City of Chicago IT

03:10:52  24  Department.

03:10:52  25         I think we can do it in a week, but I don't want to

03:10:56 1 overpromise and undergive.

03:11:00 2 THE COURT:  The problem with that, and I am not

03:11:02 3 making any ruling whatsoever, is that it depends on the

03:11:07 4 honesty of the investigator.

03:11:09 5 MS. NOLLER:  So do the paper documents.

03:11:11 6 THE COURT:  Not necessarily.

03:11:13 7 MS. NOLLER:  If someone was absolutely adamant that

03:11:16 8 they were going to delete something in their file, it wouldn't

03:11:19 9 come up during the search.

03:11:20 10 THE COURT:  There is a difference between absolute --

03:11:28 11 I don't know the noun -- adamancy and scrubbing your

03:11:29 12 documents.

03:11:31 13 So maybe they had the foresight, if they wanted to

03:11:38 14 alter the conclusion and not ever have it show up, but quite

03:11:47 15 possibly not.  And as I said, I am not making any finding

03:11:52 16 whatsoever.  It is just that any litigant is going to want to

03:11:57 17 have the documents before the deposition, and also, any

03:12:01 18 litigant is not going to just accept the word of the person

03:12:07 19 who either is the accused, or if they are the ones who have

03:12:17 20 been ordered to change their conclusion or to omit facts, they

03:12:22 21 still may not want to 'fess up to that.

03:12:28 22 So I understand the attempt to short circuit that,

03:12:32 23 but I don't think that is sufficient.

03:12:39 24 Okay.  Anything else?

03:12:41 25 MR. KOSOGLAD:  Not today, Judge.

|          |    |                                                                     |
|----------|----|---------------------------------------------------------------------|
| 03:12:42 | 1  | THE COURT:  All right.                                              |
| 03:12:43 | 2  | On the case at large, what else is going on in fact                 |
| 03:12:46 | 3  | discovery, which is, theoretically, supposed to close November      |
| 03:12:49 | 4  | 14?                                                                  |
| 03:12:49 | 5  | MS. MAISURIA:  Your Honor, from our perspective, we                 |
| 03:12:52 | 6  | have two depositions left to take.  One is Assistant State's        |
| 03:12:56 | 7  | Attorney Bonnie Greenstein.  Her deposition has been scheduled      |
| 03:12:59 | 8  | for sometime in November.  It has been rescheduled a few            |
| 03:13:03 | 9  | times, but I believe we now have a firm date.                       |
| 03:13:05 | 10 | And we are still awaiting dates for Detective                       |
| 03:13:10 | 11 | Switalski.  I was informed by Mr. Kabacinski that he is on          |
| 03:13:14 | 12 | medical leave.  We have been trying to get dates for him since      |
| 03:13:18 | 13 | I believe March of 2016, and it may have been going back as         |
| 03:13:20 | 14 | far as January.  And I was just informed that because he is on      |
| 03:13:24 | 15 | medical leave, there are apparently no accommodations that can      |
| 03:13:27 | 16 | be made for his deposition, and they are not willing to             |
| 03:13:29 | 17 | produce him at all.                                                 |
| 03:13:30 | 18 | I have asked for some details as to what -- what the                |
| 03:13:34 | 19 | issue is, why accommodations will not be possible, and I have       |
| 03:13:37 | 20 | also some asked for some details as to when his medical leave       |
| 03:13:40 | 21 | began, because we have been asking for this individual since        |
| 03:13:44 | 22 | March.  It has been about six months, and I have not received       |
| 03:13:48 | 23 | a response to my inquiries.                                         |
| 03:13:49 | 24 | THE COURT:  Okay.                                                   |
| 03:13:50 | 25 | What is going on?                                                   |

|        |    |                                                                      |
|--------|----|----------------------------------------------------------------------|
| 03:13:53 | 1 | MR. KABACINSKI: So, as to Detective Switalski's |
| 03:13:56 | 2 | medical condition, he is on disability; he is not on medical |
| 03:13:59 | 3 | leave. He is not expected to return to the Chicago Police |
| 03:14:03 | 4 | Department at any point in the future. |
| 03:14:04 | 5 | I don't know how much further I can get into the |
| 03:14:08 | 6 | specifics of his medical condition. I don't actually know |
| 03:14:11 | 7 | specifically what the condition is. |
| 03:14:12 | 8 | I know I have spoken to his doctor, I know that the |
| 03:14:15 | 9 | doctor is willing to write us a note to that effect, and it |
| 03:14:19 | 10 | can be filed under seal. But it is my understanding that he |
| 03:14:23 | 11 | has a condition that prevents him from even leaving his house |
| 03:14:28 | 12 | some days and that no accommodations can be made to have him |
| 03:14:34 | 13 | sit for a deposition. It simply would be too stressful. He |
| 03:14:38 | 14 | can't do it. |
| 03:14:39 | 15 | THE COURT: So remind me -- first, spell his name. |
| 03:14:43 | 16 | MR. KABACINSKI: Sure. It's S-w-i-t-a-l-s-k-i. |
| 03:14:47 | 17 | THE COURT: Okay. |
| 03:14:49 | 18 | And what is -- and this is for the plaintiff. What |
| 03:14:52 | 19 | is his alleged role? |
| 03:14:52 | 20 | MS. MAISURIA: He is one of the detectives that's |
| 03:14:54 | 21 | involved in investigating this incident. Specifically, he is |
| 03:14:57 | 22 | involved in taking the statement of Reginald Benson, who was |
| 03:15:00 | 23 | an individual in the car with Mr. Johnson before he was shot. |
| 03:15:05 | 24 | Mr. Benson gave a statement to detectives later that |
| 03:15:09 | 25 | night, basically saying that he heard some racking sound in |

03:15:12 1 the car and suggesting that there was a gun being cocked in

03:15:16 2 the back seat, which the detectives relied on in finding that

03:15:20 3 Mr. Johnson did have a gun.

03:15:23 4        Mr. Benson, when he was deposed, stated that he felt

03:15:32 5 pressured by detectives when he made that statement, and that

03:15:35 6 the whole idea of the gun being racked and hearing that sound

03:15:39 7 actually was suggested to him by detectives, which is why we

03:15:46 8 want to take the detective's deposition.

03:15:46 9       THE COURT: And Detective Switalski is one of the

03:15:50 10 alleged -- one of the detectives who allegedly intimidated

03:15:52 11 him?

03:15:53 12       MS. MAISURIA: Mr. Benson was not able to identify

03:15:56 13 him by name, but he said it was the detective that dealt

03:15:58 14 mostly with him and provided the statement, and Detective

03:16:02 15 Switalski is the one listed in all the reports.

03:16:04 16       We deposed another detective, Detective Girardi

03:16:07 17 (phonetic), who we said that Detective Switalski is the one

03:16:10 18 that took the statements, so all signs are pointed at this

03:16:13 19 detective.

03:16:13 20       THE COURT: But he is not a named defendant?

03:16:15 21       MS. MAISURIA: He is not.

03:16:16 22       THE COURT: But you represent him for purposes of the

03:16:18 23 deposition?

03:16:19 24       MR. KABACINSKI: Correct, Judge.

03:16:21 25       THE COURT: Okay.

03:16:22    1          So we will need not just a note, but actual medical
03:16:28    2     records, the underlying medical records, that form the basis
03:16:33    3     for the argument, essentially a motion to quash the subpoena,
03:16:41    4     although you have not formally subpoenaed him?
03:16:43    5          MS. MAISURIA:  It was just noticed.
03:16:44    6          And Your Honor, I am not sure whether this will go
03:16:48    7     into play either, but as I mentioned, I would like some
03:16:49    8     information as to when his medical condition arose, because we
03:16:53    9     have been trying to schedule this for 6 months.  There were
03:16:56   10     repeated emails sent saying, please get me dates, please get
03:16:59   11     me dates, and I just never received an adequate response from
03:17:02   12     the City.
03:17:03   13          THE COURT:  Okay.
03:17:04   14          Do you dispute that they have been trying since
03:17:07   15     March?
03:17:07   16          MR. KABACINSKI:  I do not dispute that, Your Honor.
03:17:10   17     But what I will say is that when this all started, we didn't
03:17:14   18     know where he was.  So we are trying to get in touch with him.
03:17:17   19     We can't get in touch with him back in March, and that's why
03:17:20   20     it is taking so long.  We finally determined he is on medical
03:17:24   21     leave, he is not coming back.  This all has happened in the
03:17:27   22     last few weeks.
03:17:29   23          I don't know how long he has been on medical leave.
03:17:32   24     I can't represent that to the Court.  I will represent that it
03:17:35   25     has been a substantial amount of time.  It has been at least

| | | |
|---|---|---|
| 03:17:39 | 1 | six months, but I don't know exactly. |
| 03:17:41 | 2 | THE COURT:  So the length of time it took to figure |
| 03:17:47 | 3 | out his disability status may or may not be an issue.  All |
| 03:17:51 | 4 | right?  Because if he has been on this status for longer than |
| 03:17:54 | 5 | six months, it is not an issue.  If it is shorter, then it may |
| 03:17:58 | 6 | become an issue, and we can look into that further at that |
| 03:18:01 | 7 | point. |
| 03:18:05 | 8 | So this is what we will do:  File a motion -- the |
| 03:18:09 | 9 | defense will file a motion for a protective order, basically, |
| 03:18:15 | 10 | to prevent the deposition.  So support that with medical |
| 03:18:22 | 11 | records, which you can file under seal, but not ex parte, it |
| 03:18:28 | 12 | will be exposed to plaintiff, as well as sufficient medical |
| 03:18:34 | 13 | records to show -- not just to show the condition, but also |
| 03:18:39 | 14 | when the onset occurred, and that might just wipe out the -- |
| 03:18:46 | 15 | how much diligence or not there was in responding. |
| 03:18:49 | 16 | But then with respect to the deposition itself, if |
| 03:18:53 | 17 | the doctor is going to opine, it ought to be very specific as |
| 03:18:57 | 18 | to what the limitations are, and if it is a mobility issue, |
| 03:19:07 | 19 | then there may be some need to arrange a deposition in his |
| 03:19:11 | 20 | home.  If it is a mental issue, then we will scrutinize the |
| 03:19:19 | 21 | medical records for that as well. |
| 03:19:23 | 22 | So file that -- and obviously, if you need to get a |
| 03:19:31 | 23 | subpoena to the physician, then you can do that, but on |
| 03:19:36 | 24 | October 19, so two weeks out. |
| 03:19:43 | 25 | MS. FRONCZAK:  We were just thinking -- I don't know |

| | |
|---|---|
| 03:19:46 | 1 |
| 03:19:50 | 2 |
| 03:19:52 | 3 |
| 03:19:55 | 4 |
| 03:19:58 | 5 |
| 03:20:02 | 6 |
| 03:20:05 | 7 |
| 03:20:07 | 8 |
| 03:20:11 | 9 |
| 03:20:15 | 10 |
| 03:20:18 | 11 |
| 03:20:19 | 12 |
| 03:20:29 | 13 |
| 03:20:35 | 14 |
| 03:21:09 | 15 |
| 03:21:14 | 16 |
| 03:21:17 | 17 |
| 03:21:18 | 18 |
| 03:21:23 | 19 |
| 03:21:32 | 20 |
| 03:21:36 | 21 |
| 03:21:41 | 22 |
| 03:21:51 | 23 |
| 03:21:56 | 24 |
| 03:22:09 | 25 |

that Mr. Switalski would agree to the release of his medical records.  To the extent that he won't waive that, should we file the appropriate HIPAA order with the Court?

THE COURT:  Yes.  Then go ahead and file a subpoena. If there is not already a HIPAA -- I am making a finding that it is necessary for litigation, so the exception applies, and then you can subpoena the physician.

And let the physician's office know that you have an October 19 deadline and that the Court has authorized an accelerated motion to compel if they don't provide you the records on time.

MS. FRONCZAK:  Okay.

THE COURT:  Okay.  Then let's reconvene on the IPRA issue -- let's see.  Next week is pretty ugly.  So let's do this:  October 17 at --

Sandra, did we set something this morning for the 17th?

THE COURTROOM DEPUTY:  No, Judge.

THE COURT:  -- (continuing) 9:30.

So this second supplemental response, since we won't meet until the 17th, kick it out until the 12th.  And when the plaintiff gets the response, take a look at it, and then it may be fruitful before the 17th to confer with the other side again, at least on ideas on how to make this production, if I end up ordering it.

03:22:11   1      The burden is, I think, the crucial issue at this
03:22:18   2  point.  I do believe the deliberative process would cover the
03:22:25   3  decisionmaking.  Even though it is not to set global policy,
03:22:29   4  these kind of individual government decisions, I think, are
03:22:33   5  covered by the deliberative process.  Some of these
03:22:38   6  deliberative process cases arise out of individual government
03:22:44   7  decisions on whether to file a labor complaint or prosecution,
03:22:49   8  so I think it is covered by deliberative process.
03:22:52   9      At the same time, I do believe it is relevant, and
03:22:55  10  the Guzman case, which the defense cited, also acknowledged
03:22:59  11  that this kind of back and forth can be relevant to a Monell
03:23:05  12  claim, and it will likely come down to the burden though.
03:23:15  13      All right.  So we will reconvene on that October 17th
03:23:19  14  date on the IPRA issue.
03:23:20  15      And then I will set another -- assuming I can resolve
03:23:24  16  that either then or very quickly, we will set another status
03:23:29  17  after that, so we are not going to do that today.  At the next
03:23:32  18  hearing, we will set another status that will probably be
03:23:35  19  pretty quick to figure out the Detective Switalski situation.
03:23:40  20      MS. MAISURIA:  Thank you.
03:23:41  21      MR. KOSOGLAD:  And one last issue before we
03:23:45  22  reconvene.  We filed a motion today I think just before the
03:23:47  23  court hearing started.  Our people were working on it.  I am
03:23:47  24  sure if they hadn't gotten it on file before, I am sure they
03:23:52  25  have by now, but --

| | |
|---|---|
| 03:23:53 | 1 |
| 03:23:54 | 2 |
| 03:23:55 | 3 |
| 03:23:59 | 4 |
| 03:24:03 | 5 |
| 03:24:06 | 6 |
| 03:24:10 | 7 |
| 03:24:11 | 8 |
| 03:24:14 | 9 |
| 03:24:18 | 10 |
| 03:24:19 | 11 |
| 03:24:22 | 12 |
| 03:24:25 | 13 |
| 03:24:27 | 14 |
| 03:24:30 | 15 |
| 03:24:30 | 16 |
| 03:24:30 | 17 |
| 03:24:33 | 18 |
| 03:24:36 | 19 |
| 03:24:39 | 20 |
| 03:24:43 | 21 |
| 03:24:44 | 22 |
| 03:24:48 | 23 |
| 03:24:50 | 24 |
| 03:24:55 | 25 |

THE COURTROOM DEPUTY:  It's on the docket now.

MR. KOSOGLAD:  -- (continuing) with respect to some issues going on with the IPRA investigators from this case and their investigations, we need dates to take deposition dates for them to be taken, but there has also been some problems with the discovery responses from IPRA in this case and some requests to admit.

So we filed a motion about that, and it might be prudent to set a briefing schedule, or we can notice it and have one set.

THE COURT:  You believe that you have conferred with them?  You have had your Rule 37 conferral?

MR. KOSOGLAD:  Yes, Judge.

MR. KABACINSKI:  Your Honor, if I might be heard on that.

THE COURT:  Okay.

MR. KABACINSKI:  We spoke about this issue last Friday afternoon, and Mr. Kosoglad told us he was going to file a motion to compel.  And we asked him what he wanted, what remedy he wanted from us, and his exact words were, you can find out in the motion.

So it is our position that we have not met and conferred on this.  We have not tried to remedy this.

There were some depositions that were canceled, readily canceled.  The City has agreed to pay for those.  So

03:25:00  1    far as that goes, we think that issue is moot.  But as to the

03:25:02  2    rest of this, whatever is in that motion, I don't know.

03:25:04  3            MR. KOSOGLAD:  I can clarify.  This is not a motion

03:25:06  4    for discovery at this point.  This is a motion for sanctions,

03:25:09  5    and --

03:25:09  6            MR. KABACINSKI:  And again --

03:25:11  7            MR. KOSOGLAD:  -- (continuing) we did confer.  We

03:25:12  8    asked on the record numerous times for an explanation as to

03:25:17  9    what happened.

03:25:18  10            Basically, Defendant Hernandez in this case gave a

03:25:21  11   statement to IPRA, and it wasn't produced for over four months

03:25:25  12   while all the fact discovery was going on.  There were other

03:25:27  13   witness statements that were also not produced.  And we found

03:25:31  14   out about it at the deposition of the IPRA investigators, and

03:25:35  15   we asked for an explanation.  This is back in August.  They

03:25:38  16   didn't respond, we sent them an email, they didn't respond for

03:25:42  17   over a month.  I sent another email, and I said, okay, we are

03:25:45  18   going forward with a motion.  They called right away, we

03:25:48  19   discussed it, and we explained it to them.  We didn't say, you

03:25:51  20   could find out in the motion; we told them exactly what the

03:25:54  21   issues were.

03:25:55  22            You were present.  You know what the issues were.

03:25:57  23   There have been some failures to comply with discovery.

03:26:00  24   There's been false admissions in requests to admit about facts

03:26:03  25   that are germane to the case, and we have laid it all out in

03:26:06  1    the motion.

03:26:06  2          So to the extent that there has not been a good faith

03:26:10  3    effort to resolve this, we think the motion speaks for itself.

03:26:14  4    We put in there what the corresponding efforts were on our

03:26:19  5    part.  I don't know how that would be an issue.

03:26:22  6          MS. NOLLER:  For the record, IPRA -- counsel for IPRA

03:26:27  7    was not contacted, neither was Patrick, nor myself.

03:26:29  8          MR. KOSOGLAD:  That is true, IPRA is not a party in

03:26:32  9    the case.  This is getting confusing to us, because IPRA was

03:26:35  10   represented by two different law firms for a period.  They

03:26:38  11   also have Corporation Counsel representing the individual

03:26:41  12   investigators who were present, and we are not seeking a

03:26:45  13   sanction against IPRA.  It's against the City, and IPRA is

03:26:51  14   part of the City.  And from our understanding, it was the City

03:26:51  15   that didn't produce the information that ought to have been

03:26:54  16   produced.

03:26:54  17         They knew that their discovery was incomplete, and

03:26:57  18   they didn't say anything to us; they didn't do anything about

03:27:00  19   it.

03:27:02  20         IPRA also has had attorneys -- had an attorney

03:27:05  21   present, Claudia Silva (phonetic), when all of these issues

03:27:09  22   arose.

03:27:12  23         THE COURT:  Okay.

03:27:12  24         I will set a briefing schedule, and then you can

03:27:16  25   still argue that they did not sufficiently confer.  That is

| | |
|---|---|
| 03:27:20 | 1 |
| 03:27:24 | 2 |
| 03:27:46 | 3 |
| 03:27:52 | 4 |
| 03:27:53 | 5 |
| 03:27:57 | 6 |
| 03:28:02 | 7 |
| 03:28:06 | 8 |
| 03:28:09 | 9 |
| 03:28:14 | 10 |
| 03:28:18 | 11 |
| 03:28:19 | 12 |
| 03:28:22 | 13 |
| 03:28:29 | 14 |
| 03:28:33 | 15 |
| 03:28:37 | 16 |
| 03:28:40 | 17 |
| 03:28:44 | 18 |
| 03:28:44 | 19 |
| 03:28:47 | 20 |
| 03:28:50 | 21 |
| 03:28:55 | 22 |
| 03:28:58 | 23 |
| 03:29:02 | 24 |
| 03:29:05 | 25 |

completely up to you to do that.

So you haven't seen it, but let me give you -- let's see -- October 24, October 31 to reply. And then we will just leave that hanging for now.

MR. KOSOGLAD: Okay.

THE COURT: Anything else from the City's counsel?

MR. SCAHILL: From Hernandez's perspective, the last time we were in here, there was a date set for service of nonparties. One of the more elusive of the nonparties was, in fact, served. Hopefully, knock on wood, they will show up for a deposition.

There were three others that we have been trying to serve, and we may -- you know, including, I believe -- my system was going to have them go out again this last weekend, but the deadline was Monday, and I don't believe those were successful, a couple of them, so we might be filing something. I will confer with counsel. I know there was a proviso in the minute order about diligence and the like, so I'll confer with them.

But we may file something with respect to -- I think there are about three of these folks that have proved elusive, despite my guy being out there on numerous occasions at residences that I think are confirmed residences.

THE COURT: And so from your perspective, those are the only remaining depositions, other than the Monell issues

03:29:10　1　　that are hanging out?

03:29:10　2　　　　　　MR. SCAHILL:  Well, the ones that Ms. Maisuria had

03:29:14　3　　referenced also, Switalski and Bonnie Greenstein, yes, for

03:29:24　4　　fact witnesses.

03:29:24　5　　　　　　THE COURT:  Right.

03:29:25　6　　　　　　And is that the same for the City, I take it?

03:29:28　7　　　　　　MR. KABACINSKI:  That is our understanding as well,

03:29:30　8　　Your Honor.

03:29:31　9　　　　　　THE COURT:  And then with regard to -- other than

03:29:33　10　　this aspect of the Monell discovery, is there anything else

03:29:38　11　　going on with Monell discovery?

03:29:40　12　　　　　　MR. KOSOGLAD:  There is the production of the

03:29:42　13　　shooting files, which we don't -- which has not begun.  We

03:29:50　14　　don't really have any kind of understanding of when that is

03:29:53　15　　going to be produced.  They told us in August that it would

03:29:57　16　　begin now, and it hasn't begun, so I don't know.

03:30:01　17　　　　　　MS. MAISURIA:  They have agreed to produce them on a

03:30:04　18　　rolling basis, a hundred files a week, but they are unable to

03:30:07　19　　tell us when they can start doing that.

03:30:09　20　　　　　　MR. KABACINSKI:  And if I may be heard on that, Your

03:30:11　21　　Honor.

03:30:11　22　　　　　　These files were produced to us from the Department

03:30:14　23　　of Justice as part of the DOJ investigation, larger DOJ

03:30:17　24　　investigation, of Chicago Police Department policies and

03:30:20　25　　practices.

03:30:21  1    Generally, when we get a log file, it is a single PDF
03:30:26  2  of the summary digest report, the findings, and then all the
03:30:31  3  attachments.
03:30:32  4    It was not produced to us from the Department of
03:30:35  5  Justice in that way.  We just have thousands of individual
03:30:39  6  PDFs that are not labeled, that are not in order, and so we
03:30:43  7  are going through those in sort of a first-pass review, order
03:30:48  8  them, put them in a format we can produce to plaintiff that
03:30:51  9  makes sense, because the time period for the DOJ files that
03:30:54 10  were produced to us is different from the time period for the
03:30:59 11  files that were requested by plaintiff.  It is broader.  So
03:31:01 12  not all the files that we have will be responsive to the
03:31:05 13  agreement we have made with plaintiff.  So we have to screen
03:31:07 14  them first, and then we have to redact them and Bates stamp
03:31:13 15  them.
03:31:13 16    Currently, I believe there are 140-some volumes of
03:31:16 17  files, they are in just individual file folders on our drive.
03:31:21 18  The first pass review has made it through about 45 at this
03:31:26 19  point.  We are getting through, it seems like, about 20 a
03:31:29 20  week.
03:31:29 21    Once that is completed, I have been told by the
03:31:34 22  paralegals that will be in charge of redacting and Bates
03:31:38 23  stamping and producing these that they can get through a
03:31:41 24  hundred files a week, but it is a matter of getting them to
03:31:43 25  that point before we can be able to guarantee that.

03:31:48  1          THE COURT:  Do you -- Okay.
03:31:50  2          So you went to the DOJ because they had already had
03:31:55  3  electronic versions of the file?
03:31:58  4          MR. KABACINSKI:  Correct, Your Honor.
03:31:59  5          We made an agreement with plaintiff's counsel,
03:32:01  6  because we were doing this as part of the DOJ investigation
03:32:04  7  already.  It was going to save plaintiff's counsel an
03:32:08  8  estimated 50,000 or $60,000 in discovery, because we agreed to
03:32:13  9  split costs, and with the amount of documents that we are
03:32:16  10 talking about here, we had an estimate in the low six figures.
03:32:21  11 This was work that had already been done, it was being done as
03:32:25  12 part of that, and so we could do it for free.  It just was
03:32:29  13 going to take a little while.  And that was the agreement.
03:32:32  14 And I think -- we are at a point now where we know what needs
03:32:36  15 to be done, and we have some time horizon to do it.  And I
03:32:43  16 don't think it is really holding up the rest of the case.
03:32:46  17         We are still engaged in fact discovery on the
03:32:50  18 underlying case.  I can't guarantee a date certain by which we
03:32:52  19 can begin this, but I don't think it should take a whole lot
03:32:55  20 longer.
03:32:56  21         THE COURT:  Just to be clear --
03:32:57  22         MR. KABACINSKI:  I can see that Mr. Kosoglad is not
03:33:00  23 pleased by that, but I mean, that's where we're at.
03:33:02  24         MR. KOSOGLAD:  I think actually -- I was going to
03:33:02  25 say, okay.  I don't think that I'm complaining about that at

03:33:09    1    all.

03:33:09    2                THE COURT:  I understand the misinterpretation of

03:33:11    3    body language.

03:33:11    4                MR. KABACINSKI:  Then I apologize.

03:33:13    5                THE COURT:  That is okay.

03:33:14    6                Let me just ask, though, do you think that the DOJ

03:33:17    7    gave you the electronic versions in the way that they got it?

03:33:21    8                MR. KABACINSKI:  I have no idea, Your Honor.  I don't

03:33:25    9    know how it was produced to DOJ, how they have cataloged it,

03:33:30   10    how it is in their system, and then how it got in our system.

03:33:34   11                THE COURT:  Because the way that you usually get it

03:33:37   12    from IPRA is a single PDF, and it is in that format that you

03:33:40   13    just described, right?

03:33:42   14                MR. KABACINSKI:  Generally, yes.

03:33:43   15                THE COURT:  And so I would think that when IPRA

03:33:46   16    produced it to the DOJ, they would have done the same thing.

03:33:50   17                MR. KABACINSKI:  You know, I think when we first

03:33:52   18    discussed this with plaintiff's counsel, that was our

03:33:55   19    understanding as well.

03:33:56   20                THE COURT:  Okay.

03:33:57   21                MR. KABACINSKI:  As it turns out, after looking at

03:33:59   22    some of these volumes is that each individual attachment is

03:34:02   23    its own PDF, instead of being all in one folder.

03:34:05   24                THE COURT:  And so does IPRA not have the version

03:34:15   25    that they sent to the DOJ?

03:34:17  1          MR. KABACINSKI:  I don't know the specifics on that,
03:34:20  2    Your Honor.
03:34:20  3          THE COURT:  Why don't you ask them?  Because it does
03:34:24  4    not make sense that IPRA would not have kept their own copy,
03:34:28  5    although maybe it is on a local drive.
03:34:33  6          (Whereupon, laughter was heard in the courtroom.)
03:34:35  7          THE COURT:  Jokes aside, if they produced it in the
03:34:38  8    way that you are used to it, then maybe they can just give you
03:34:42  9    a copy of that, and you don't have to do -- you can cut the
03:34:51  10   middleman out.
03:34:54  11         And then also -- because you have these in individual
03:34:57  12   PDFs, the -- it was not organized in a way where it was
03:35:08  13   investigation by investigation?
03:35:10  14         MR. KABACINSKI:  So what it seems like is that you
03:35:12  15   have all of the files from one investigation that are all
03:35:17  16   together, they are all in a row, but then the files
03:35:20  17   immediately preceding that and immediately following that may
03:35:24  18   be from an investigation five years in the future or five
03:35:27  19   years in the past.  They are not really in chronological
03:35:30  20   order.
03:35:31  21         THE COURT:  And I can see the problem there.  Okay.
03:35:34  22         Had it been in chronological order, then it is not
03:35:37  23   that hard to --
03:35:38  24         MR. KABACINSKI:  I agree.
03:35:39  25         THE COURT:  (Continuing) -- to select a bunch of

03:35:42  1   documents and create a PDF.

03:35:44  2         MR. KABACINSKI:  I agree.

03:35:45  3

03:35:46  4         THE COURT:  Okay.

03:35:46  5         So please do ask IPRA whether they kept a copy, and

03:35:50  6   maybe theirs is in a chronological way.  But other than that,

03:35:54  7   I think they are doing the best they can.

03:35:57  8         Okay.  I will see you October 17th.

03:36:01  9         MR. KOSOGLAD:  Thank you.

03:36:01  10        MS. MAISURIA:  Thank you, Your Honor.

03:36:05  11        MR. KABACINSKI:  Thank you.

03:36:07  12        MS. FRONCZAK:  Thank you.

03:36:13  13        MS. NOLLER:  Thanks, Your Honor.

03:36:15  14        MR. MCMAHON:  Thank you, Your Honor.

03:36:17  15        MR. SCAHILL:  Thank you.

03:36:21  16        THE COURTROOM DEPUTY:  Court is adjourned.

          17

          18        (Proceedings concluded.)

          19

          20

          21

          22

          23

          24

          25

1

2

3                        C E R T I F I C A T E

4           I certify that the foregoing is a correct transcript
        from the record of proceedings in the above-entitled matter.
5

6

7    /s/Krista Burgeson, CSR, RMR, CRR      October 24, 2016
     Federal Official Court Reporter        Date

8

9

03:36:22
03:36:22  10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25