**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DOROTHY HOLMES, on her own behalf and as Special Administrator of the Estate of RONALD JOHNSON III, deceased, | ) ) ) ) | |
| Plaintiff, | ) | No. 1:14-CV-08536 |
| v. | ) ) ) | Judge Edmond E. Chang |
| OFFICER GEORGE HERNANDEZ, individually, and THE CITY OF CHICAGO, | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Shortly after midnight on October 12, 2014, Chicago Police Officer George Hernandez shot and killed Ronald Johnson III as Johnson fled towards Washington Park. R. 106, Compl. ¶¶ 6–9; R. 396, Defs.' Statement of Material Facts (DSOF) ¶ 4.[1] Johnson's mother, Dorothy Holmes, now sues Hernandez, and the City of Chicago as indemnifier, for what she alleges was the unconstitutional use of deadly force against Johnson in violation of the Fourth Amendment, along with several state law claims.[2] Hernandez and the City have moved for summary judgment, arguing that Hernandez's actions were a reasonable response to the threat posed by Johnson, or if not, that the officer is at least entitled to qualified immunity. R. 398, Defs.' Joint Mot. for Summ. J (Defs.' Mot.). But as this opinion will explain, several key facts in support

---

[1]Citations to the record are marked as "R." followed by the docket entry number, and the page or paragraph number if applicable.

[2]This Court has jurisdiction over Holmes's 42 U.S.C. § 1983 claims under 28 U.S.C. § 1331, and pendant jurisdiction over her state law claims under 28 U.S.C. § 1367.

of the Defendants' motion remain genuinely in dispute. Specifically, Holmes has created a dispute over whether Hernandez had probable cause to believe that Johnson was armed when the officer shot him. Viewing the facts in the light most favorable to the Plaintiff, Hernandez did not act reasonably, nor would a reasonable officer believe that he had acted reasonably, which means qualified immunity does not apply, either. The summary judgment motion thus is denied.

## I. Background

In deciding Hernandez and the City's motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party—in this case, Dorothy Holmes (on behalf of Ronald Johnson). *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A. Before the Shooting: Johnson's Evening

On the evening of October 11, 2014 (and running into October 12), Ronald Johnson III was spending time with three friends: Reginald "Reggie" Benton, Jr., Marquise Price, and Marlon Johnson (Ronald's cousin). DSOF ¶ 63. Benton drove the four of them in his car, and Ronald Johnson sat behind Benton in the rear passenger seat for at least part of the evening. *Id.* ¶ 64. Around 12:30 a.m. (now October 12), after the four men left a party and started driving down 53rd Street, shots were fired at the car, shattering its back windshield. *Id.* ¶ 65. As Benton kept driving, the men checked themselves to make sure they were not hurt. R. 405, Pl.'s Statement of Additional Material Fact (PSOAF) ¶ 1, DSOF ¶ 66. As Benton drove down Prairie

2

Street, he heard a metallic click from the backseat. DSOF ¶ 66.[3] Price did not hear the click. PSOAF ¶ 2.

At the direction of one of his passengers, Benton drove the car back to the intersection where they had left a party and where the car had been shot. DSOF ¶ 72. A couple of minutes after they returned to that location, Price, standing on 53rd Street, saw Johnson come running out of an alley and then continue running eastbound on 53rd towards Price. *Id.* ¶ 74.

To set the scene at this point: 53rd street runs east-west, and intersects with King Drive, a multi-lane street running from north to south. DSOF ¶ 5. The intersection of 53rd and King is a T-intersection, because King forms the western boundary of Washington Park. *Id.* There is a bus stop on the west side of King, south of 53rd St. *Id.* The bus stop is positioned just south of 53rd St—about three or four car-lengths from the corner. *Id.*; R. 397-3, Defs.' Exh. 3, Google Map. A north-south alley opens onto 53rd Street between King to the east and Calumet Drive, to the west. DSOF ¶ 5. The area is shown here, with 53rd Street running east across the page, ending at Washington Park:

---

[3]The defense cites a statement that Benton made to an Assistant State's Attorney later that night, in which Benton said the click sounded like a gun being "racked" and said that he associated the sound with a gun. DSOF ¶¶ 66–69. Benton's later deposition testimony complicates the picture. Holmes alleges that Benton invented this association with a gun based on pressure from police detectives, who told him a gun had been found in his car and made him understand that he needed to tell a story to explain the gun to avoid getting into trouble, himself. PSOAF ¶¶ 39–42. Viewing the facts in the light most favorable to Johnson, a reasonable jury could credit Benton's deposition testimony that he did not independently associate the click with a gun.



Defs.' Exh. 3, Google Map.

### B. Before the Shooting: Hernandez Hears Police Reports

Meanwhile, during that same evening, Chicago Police Officer George Hernandez was on duty as a tactical officer in the Second District, specifically focused on a "violence zone" bounded by King on the east and State on the west, and 51st and 55th on the north and south. DSOF ¶ 6. He was assigned to an unmarked police car with Officers Manuel Leano and Robert Gonzalez. *Id.* ¶ 7. Leano drove, Gonzalez sat in the front passenger seat, and Hernandez sat in the back. *Id.* Between the beginning of his shift, at 6 p.m., and the shooting at issue in this case, Hernandez heard multiple calls of "shots fired" in his assigned area over the police radio. *Id.* ¶¶ 6, 8.

About seven minutes before Hernandez shot Johnson, a police sergeant reported over the police radio that, from the sergeant's position in the parking lot of the Second District police station, at 5101 S. Wentworth, he had heard seven or eight

shots that sounded like they came from the east and "a little ways down" (presumably, south). DSOF ¶ 9; R. 404, Pl.'s Resp. to DSOF ¶ 9; R. 397-11, Defs.' Exh. 11, Zone 5 Radio 003430 to 013338 at 0:00–0:30v (Zone 5 Radio). Hernandez heard this report. DSOF ¶ 9. Then, about one minute later, the dispatcher reported over the radio that an anonymous caller from 346 E. 53rd St. had reported hearing five shots and seeing three males with hoods walking past, eastbound. DSOF ¶ 10; Zone 5 Radio 1:30–2:10. About 15 seconds later, a report of nine or 10 shots fired at 53rd and King came over the radio. DSOF ¶ 10; Zone 5 Radio 2:25–2:30. Then came a report that at 346 E. 53rd Street, two "male blacks" had been shooting, and then took off east-bound through the alley, both wearing dark clothing. DSOF ¶ 10; Zone 5 Radio 2:30–47. (This is the only report that describes the shooters.) A minute or so later, the dispatcher reported a "person with a gun ticket" at 5352 S. King Street in which an anonymous caller said two to three men with guns had run into the building. DSOF ¶ 10; Zone 5 Radio 3:58–4:27. As these reports came over the radio, Hernandez, Gonzalez, and Leano drove east on 51st Street towards King Drive, feeling a sense of urgency because the reports came from their assigned area. DSOF ¶ 11. (Aside from the sergeant reporting from the parking lot, it is not clear which of the reports Hernandez heard in full.)

A couple of minutes later, as Hernandez's car was nearing the scene, Officers Phillip Hooper and Grant Monte came on the radio to report that a car window had been shot out at 5312 S. King. DSOF ¶ 12; Zone 5 Radio 6:28–35. Hooper and Monte were with Reginald Benton, the owner and driver of the car, just south of the bus stop on the west side of King Drive. DSOF ¶¶ 12, 13. Immediately after Hooper and

Monte's report, Sergeant Michael Costello reported over the radio that a "male black" in a black and blue hoodie was running east-bound on 53rd. DSOF ¶ 15; Zone 5 Radio 6:40–43. Immediately after that, Officer Barbara Gilliana reported over the radio that a "male black" was running southbound on King, wearing a black hoodie and beige pants—the dispatcher repeated this report, but switched the colors, saying beige sweatshirt and black pants. DSOF ¶ 16; Zone 5 Radio 6:43–51. Gilliana is audibly running as she speaks on the radio. DSOF ¶ 16; Zone 5 Radio 6:43–51. Officer Hernandez heard Gilliana's report as his car came south on King Drive and crossed 53rd and King. *Id* ¶ 16–18.

None of the police reports that Hernandez heard stated that an officer was in pursuit of a suspected armed person with a weapon. PSOAF ¶ 3. On this crucial question of whether Johnson was armed, Gilliana testified in her deposition that, in her pursuit of Johnson, she never saw his hands or a gun in his hands, even though she had a clear view of him and could otherwise describe his appearance in some detail. PSOAF ¶ 11; R. 397-12, Defs.' Exh. 12, Gilliana Dep 51:17–53:1, 59:14–23, 61:14–20, 159:17–20.

### C. Encounter with Monte and Hooper

As Benton was speaking with Monte and Hooper, and as Hernandez's car crossed the intersection of 53rd and King, Johnson came running around the corner, towards the bus stop on King. DSOF ¶ 18. Hernandez saw Johnson as he ran around the corner, and saw that he matched one of the descriptions he had heard on the radio, namely, that of an individual in a dark hoodie and light pants. DSOF ¶ 19.

6

Johnson can be seen rounding the corner on footage taken by the dashboard camera of a nearby police car, but he ran out of view of that camera and remained out of view for about nine seconds. *Id.* ¶ 20; R. 397-8, Defs.' Exh. 8, Chicago Police Dash Cam P0Z454 ("Dash Cam") 1:11:42–1:11:52.[4] Johnson ran towards Monte, Hooper, and Benton, all of whom were on King Drive near the bus stop. DSOF ¶¶ 17, 21.

The footage of Johnson and CPD officers, and eventually of Hernandez shooting Johnson, comes from the dashboard camera on a marked Chicago Police squad car driven that night by Officers Fatima Arif-Abraham and Sharen Calvin. PSOAF ¶ 4. The dash-cam captured video but no audio. *Id.* As Johnson came running around the corner, Arif-Abraham and Calvin's car was pulling up to a stop in the northeast lane of King Drive, south of the intersection of 53rd and King. *Id.*; Dash Cam 1:11:40–42. As Johnson runs south out of the frame of the camera, he passes the car at a distance of only one to two car-lengths—the width of the street and sidewalk. Dash Cam 1:11:40–42.

The encounter between Johnson, Monte, and Hooper was not caught on camera, and the parties' versions of it differ in important ways. Everyone agrees that Johnson ran towards Monte and Hooper, the officers told him to "stop" or "freeze," and he then turned and ran in the opposite direction. DSOF ¶¶ 21–22. The Defendants assert that Johnson made physical contact with Monte and Hooper and had a combative physical struggle with them, in the course of which Hooper fell to the

---

[4]Citations to the dash-cam video specify the video's internal run-time, and do not match the clock-time of the events captured.

ground, and both Hooper and Hernandez (watching from the car) saw that Johnson had a gun. *Id.* ¶¶ 23–27. The defense's version of the encounter will be discussed in the Analysis section below. But at the summary judgment stage, the Court credits the non-movant's version of events, and Holmes has presented competent evidence that no struggle occurred, and Johnson was unarmed.

Specifically, in Holmes's version of events, Johnson ran around the corner and ran towards the officers and Benton, coming to within about three to four feet of the officers before turning to continue running in a different direction. PSOAF ¶ 5. To support this account, the Plaintiff cites the deposition testimony of Reginald Benton, who was standing next to the officers at the time. R. 397-15, Defs.' Exh. 15, Benton Dep. 59:18–21, 108:18–21.[5] Benton testified that Johnson never came into physical contact with the officers. *Id.* 108:22–109:5. When Johnson saw Benton and the officers, Johnson simply turned and ran. *Id.* 59:10–13, 109:6–8. Benton also says neither Johnson, nor Monte, nor Hooper fell to the ground while they were near each other. PSOAF ¶ 8; Benton Dep. 60:3–8. Benton agrees that at least one officer told Johnson to "freeze" or "stop," but Johnson did not stop. Benton Dep. 59:10–13, 109:11–13. Benton is speaking from personal knowledge, so the evidence is admissible and a reasonable jury can credit it.

---

[5]The Plaintiff's Statement of Additional Facts asserts that Benton said he thought that Johnson came to within about three or four feet of the officers. PSOAF ¶ 5; Benton Dep. 26:9–11. But later, he appears to correct himself and clarify that the distance was six feet. *Id.* 59:14–21. The different distances do not matter much at this stage.

8

The deposition testimony of Officers Calvin and Arif-Abraham, who were in the squad car with the dashboard camera, also supports Holmes's version of events. PSOAF ¶¶ 5, 8.[6] Calvin was driving while Arif-Abraham rode in the front passenger seat. R. 406-5, Pl.'s Exh. E, Arif-Abraham Dep. 22:2–6. Based on the squad car's position near the intersection, and the position of Benton's car at the bus stop, it appears that Arif-Abraham and Calvin were about two to three car-lengths away from the spot where Hooper and Monte stood. *See* Dash Cam 1:11:40–42; Google Map. Arif-Abraham had a hard time estimating how far away she was from Hooper and Monte, but guessed the distance might have been about 12 yards, and asserted that she was close enough to be able to recognize the officers. Arif-Abraham Dep. 32:15–34:24. Arif-Abraham saw Johnson run towards the officers, stop "in front of" them, and then turn and run away. PSOAF ¶ 5, Arif-Abraham Dep. 34:2–11. Arif-Abraham did not see Hooper or Johnson fall to the ground. *Id*. 35:21–36:3. Calvin described Johnson running around the corner like this: "He runs into them and then he makes a beeline away from them and he slants the way he's running." R. 406-4, Pl.'s Exh. D, Calvin Dep. 60:17–19. When asked if Johnson made "any physical contact with either Hooper or Monte," Calvin replied: "Now, that I didn't see. But I'm trying to watch where he's going." *Id*. 60:21–24. Considering how close Calvin and Arif-Abraham were to Hooper

---

[6]Holmes also tries to rely on the statement that Officer Arif-Abraham made to the Independent Police Review Authority. PSOAF ¶ 8. But Arif-Abraham also gave a deposition, in which she does not repeat the statements in her IPRA statement that Holmes seeks to use. The IPRA statement is just hearsay if offered for its truth, and Holmes cannot rely on it for substantive purposes (at trial, it might qualify as a prior inconsistent statement solely for impeachment).

and Monte, their testimony amounts to testimony—when viewed in Johnson's favor—that Johnson did *not* in fact have a physical scuffle with Hooper and Monte. At the summary judgment stage, the Court must credit the Plaintiff's version of events, in which Johnson saw Hooper and Monte, turned, and ran away, with no physical struggle.[7]

As Johnson ran towards Hooper, Monte, and Benton, and then turned away, Hernandez, Gonzalez, and Leano were all still in their car driving south on King. DSOF ¶ 29. After Johnson's encounter with Hooper and Monte—which, to repeat, the Court must assume to have taken place with no physical contact—Johnson ran north on King towards Hernandez's car, which Leano had parked on the west side of King just south of 53rd St. DSOF ¶¶ 29–30; Dash Cam 1:11:42–52.[8]

Crucially, according to Holmes, Johnson was unarmed this entire time. PSOAF ¶¶ 5–7, 9, 11–13, 18–20, 22–23. In support of this proposition, she cites the

---

[7]Holmes also cites the deposition of Davonte Atwood, a civilian bystander who says he never saw Johnson come into contact with the officers. R. 406-1, Pl.'s Exh. A, D. Atwood Dep. 23:2–9. Davonte Atwood's testimony suffers from serious foundational problems that the defense correctly points out in their reply brief. R. 411, Defs.' Reply at 11–17. Most prominently, Atwood claims to have been standing at an intersection that does not exist, and he is not visible anywhere on the dash-cam footage. *Id.* Giving the Plaintiff the benefit of the doubt, as is required, it is conceivable that Atwood might be able to explain his actual location to a jury's satisfaction. But without further clarification, it is not appropriate to rely on Atwood's deposition testimony. Having said that, Atwood's testimony is not necessary to the denial of the summary judgment motion. Benton, Arif-Abraham, and Calvin create the necessary factual dispute on whether Johnson had a physical scuffle with Hooper and Monte.

[8]The parties agree that the car was parked on the east side of the street, DSOF ¶ 29, but the dash-cam footage shows the car parked on the west side. When video evidence contradicts a fact put forth by the parties, the Court may rely on the video. *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) ("When video footage firmly settles a factual issue, there is no genuine dispute about it, and we will not indulge stories clearly contradicted by the footage").

depositions and IPRA testimony of a number of officers and bystanders.[9] The Court can rely on only some of the evidence cited by Holmes, as will be explained here and in the Analysis section, but it is enough to create a genuine dispute of material fact on whether Johnson was armed. To begin with, Officer Gilliana, who chased Johnson down 53rd Street, had a close view of Johnson as she chased him and was able to notice and describe his appearance in detail—but never saw a gun. PSOAF ¶ 11; Gilliana Dep. 46:21–23, 47:17–48:3; 52:9–56:19, 57:21–58:2; 69:2–16; 76:24–77:1. Benton, too, is a key witness on this point. In his deposition, Benton testified that when Johnson was running towards him, he could see Johnson's hands in front of Johnson, close to his body, and did not see anything in Johnson's hands. Benton Dep. 105:20–23. Benton was only a few feet away from Johnson at that moment. *Id.* 59:14–21. Benton further testified that before Johnson was shot, Benton only saw Johnson running— nothing else. *Id.* 116:17–117:1.

Officer Calvin's testimony also supports Holmes's proposition that Johnson was unarmed. Calvin also said that she did not see a gun in Johnson's hand from where she sat in the driver's seat of the dash-cam car. Calvin Dep. 84:4–7. As the driver of the dash-cam car, Calvin was in a position where she should have been able to see a gun. It is true that Calvin also acknowledges that, at one point, "I lost sight

---

[9]IPRA was the Independent Police Review Authority, a City of Chicago department devoted to investigating allegations of police misconduct. It was dissolved in 2016 and replaced by the Civilian Office of Police Accountability. *See* Civilian Office of Police Accountability, "Our History," https://www.chicagocopa.org/about-copa/our-history/ (last accessed September 16, 2021).

of his hand." *Id*. 84:15. At the same time, however, Calvin gave detailed testimony about the moments when she could see Johnson's hands, and said she never saw a gun in them. *Id*. 58:14–59:15, 65:24–68:5, 68:11–21, 70:2471:6. Viewing the evidence in the light most favorable to the Plaintiff, even if Calvin lost sight of Johnson's hand for a moment, if she did not see the gun, then there was no gun.

Holmes also cites the testimony of Officers Arif-Abraham and Conroy Jones, but their testimony is not reliable on this point (even when viewed in the Plaintiff's favor), and the Court does not consider it in deciding this motion. Arif-Abraham estimated that she was about two or three car-lengths from Johnson as she was getting out of the car as he ran past, and saw Johnson running, but did not see a gun. Arif-Abraham Dep. 42:9–16, 43:9–18, 45:6–11, 45:18–23. The problem with relying on Arif-Abraham's testimony is that she specifically said she could not see Johnson's hands clearly. *Id*. 42:18–24. As for Jones, he observed Johnson running across King Drive, but his vantage point was from a moving car, about 30–40 feet away. R. 406-15, Pl.'s Exh. O, Jones IPRA Statement at 10. More importantly, Jones could not see Johnson's hands at all. *Id*. at 21. Holmes cannot rely on the testimony of Arif-Abraham or Jones to support the proposition that Johnson was unarmed. But she does not need to rely on that evidence, because a reasonable jury considering the testimony of Benton, Gilliana, and Calvin could conclude that Johnson was unarmed.

It is worth noting too that Marquise Price testified that he saw Johnson running and did not see anything in his hands. R. 397-16, Defs.' Exh. 16, Price Dep. 109:22–110:15. Price also testified that Johnson put his hands up as shots were fired.

12

*Id.* 25:1–18, 83:2–10. Although this gesture is not visible on the dash-cam video, it cannot be ruled out, because Johnson disappears from view of the camera almost the instant that the shots are fired. Dash Cam 1:11:50–55. So Price's testimony is yet another piece in creating a genuine dispute on this point.[10]

In sum, in Holmes's version of events, Johnson comes running around the corner of 53rd Street, heading south on King, unarmed. He runs to within a few feet of Hooper, Monte, and Benton, has no physical contact with them, and turns to continue his flight north on King.

### D. Johnson Flees Towards Washington Park

The next important fact, hotly disputed by the parties, is whether anybody yelled that Johnson had a gun as he was fleeing across King Drive. The defense claims that Gonzalez and Monte both shouted that Johnson had a gun. DSOF ¶¶ 28, 31. But in Holmes's version of events, nobody called out that Johnson had a gun. Officer Arif-Abraham, now standing outside her car (and only two or three car lengths away from Johnson), did not hear any officer or anyone else yell at Johnson or say anything about a gun or otherwise. PSOAF ¶ 14; Arif-Abraham Dep 45:14–17, 46:1–5. Nor did

---

[10]The Plaintiff also tries to rely on Marlon Johnson's IPRA statement as additional evidence that Johnson was unarmed. PSOAF ¶ 23, citing R. 406-8, Pl.'s Exh. H, M. Johnson IPRA Statement. The defense argues that this is inadmissible hearsay, and that the deposition testimony reflects only that Marlon Johnson does not remember what happened. Defs.' Reply at 21. The IPRA statement is indeed hearsay if offered for the truth, so the Court sets it aside for purposes of evaluating the summary judgment motion. Civilian bystanders Davonte and Vincent Atwood also testified they did not see a gun in Johnson's hands. D. Atwood Dep. 18:20–19:15, 22:3–10, 60:5–7; R. 406-2, Exh. B, V. Atwood Dep., 8:15–17, 14:2–15:1. But the Atwoods' testimony suffers from foundation problems as discussed in footnote 7, *supra*.

13

Officer Calvin, who was in the car with her window open, hear any officer tell Johnson to drop a gun or say anything else about a gun. PSOAF ¶ 14; Calvin Dep., 90:12–90:18. Remember that these two officers were with the squad car that took the dash-cam footage of the shooting. One would expect them to have been able to hear if somebody yelled that Johnson had a gun.

Holmes cites to some other witnesses for the proposition that nobody yelled about a gun, but the other witnesses' testimony does not accomplish what Holmes asks of it and is, in any case, unnecessary to establish a genuine dispute over this fact. Reginald Benton testified that he did not hear anyone yell at Johnson to drop the gun. Benton Dep. 114:2–6. But he also testified that, as Johnson was running across the street, he heard someone yell "he got a gun." *Id*. 115:22–16:6. Bystander Davonte Atwood also testified that although he heard officers yell "freeze" twice, he did not hear anybody yell to drop the gun, D. Atwood Dep. 19:6–22, but Atwood's testimony suffers from foundation problems, as noted earlier.[11]

Still, with Calvin and Arif-Abraham testifying that they heard no shouts of a gun, Holmes has enough support to assert that nobody shouted that Johnson had a gun as Johnson ran away from Hooper and Monte.

---

[11]Holmes also cites the IPRA statement of Marlon Johnson, but the Court will not consider this at all, as it is hearsay when offered for its truth. *See* footnote 9, *supra*. *See* footnote 7 for the discussion of the problems with Davonte Atwood's testimony.

## E. Hernandez Chases and Shoots Johnson

Johnson's flight path took him past Hernandez's just-parked, unmarked police car, towards Washington Park. DSOF ¶ 32. Hernandez opened the driver's side back door and got out of the car as it was stopping. *Id.* ¶ 33. By Hernandez's account, when he got out of the car, he was only about three feet from Johnson, who was running past, and Hernandez could clearly see a black gun in Johnson's hand. DSOF ¶ 34; R. 397-5, Defs'. Exh. 5, Hernandez Dep. 91:19–92:4. The dash-cam video corroborates part of the story, namely, that Hernandez was very close to Johnson as Johnson ran past. Dash-cam video 1:11:45–50. But the video simply is not clear enough to require a finding that Johnson is holding anything. *Id.* Hernandez says he shouted, "drop the fucking gun," repeatedly and "as loud as [he] possibly could." DSOF ¶ 35; Hernandez Dep. 92:5–9. The Defendants also cite to the depositions of Officers Gonzalez and Costello to support the proposition that Hernandez yelled at Johnson to drop the gun. DSOF ¶ 35. The Defendants say that other officers were also yelling "stop" and "drop the gun"—Holmes concedes only that they were yelling "stop." DSOF ¶ 38, Pl.'s Resp. to DSOF ¶ 38. Again, as discussed earlier, Holmes relies on the testimony of Arif-Abraham and Calvin to assert that nobody yelled about a gun. Johnson kept running and Hernandez chased him on foot. DSOF ¶¶ 37, 39.

Hernandez testified that, as he chased Johnson, from around five to seven feet away, he saw Johnson change the position of the gun in his hand so that Hernandez could see the right side of the barrel. DSOF ¶ 40. Hernandez testified that he did not know if Johnson was going to shoot at Hernandez, or at another officer, or at a

bystander. *Id.* ¶ 41. Hernandez never saw Johnson directly point a gun at any officer or bystander. PSOAF ¶ 17. Holmes asserts that Johnson was not running towards any officers, bystanders, or vehicles as he ran across the street. *Id.* ¶ 16. After chasing Johnson for two seconds and around five or six steps, Hernandez fired five shots at Johnson. DSOF ¶¶ 43–45; PSOAF ¶ 17. Two of these shots hit Johnson. DSOF ¶ 47. Johnson fell and landed face-down in the parkway on the east side of King Drive. DSOF ¶ 48. The Defendants assert that Hooper yelled "grab the gun" after Johnson fell, citing to Hernandez's and Hooper's depositions. *Id.* ¶ 50. Holmes denies this, citing to Gilliana's testimony that she did not hear such a shout. Pl.'s Resp. to DSOF ¶ 50; Gilliana Dep. 124:9–14. Gilliana continued moving towards Johnson after Johnson was shot and was close enough to get a clear view of his body. Gilliana Dep., 85:15–86:9.

The final moments of Johnson's flight were captured by the dash-cam on Arif-Abraham and Calvin's police car—video only, no audio. Dash Cam 1:11:42–52. A forensic video analyst, Grant Fredericks, has analyzed the police dash-cam footage of this incident. DSOF ¶ 59. Fredericks concluded that it was impossible to tell, based on the footage, if Johnson was in possession of a weapon when Hernandez shot him. *Id.*; R. 397-30, Defs.' Exh. 30, Fredericks Report 17–19. The Court has also reviewed the dash-cam footage and notes that in the final seconds of Johnson's life, he is clearly running away from Hernandez, and does not appear to turn towards Hernandez or anyone else.

16

### F. How Johnson Fell and Evidence Recovery

The parties' accounts of what happened after Johnson fell to the ground also differ dramatically, but most of these disputes are not material to the summary judgment motion. For now, what matters is that Holmes has presented evidence that based on the way Johnson fell, he did not fall with a gun in his hand as asserted by the defense. According to the Defendants, Johnson fell with his right arm at his side, palm facing upwards, and the gun at his right fingertips, as seen by Hernandez. DSOF ¶ 51. Holmes counters that Officer Monte, by contrast, saw Johnson fall with his arms above his head. PSOAF ¶ 24. Marquise Price also saw Johnson put his hands up as he was shot and fell to the ground. Price Dep. 25:1–18, 83:2–10. In addition, the Plaintiff's expert, Dr. Laura Boylan, reviewed the evidence in this case and concluded that Johnson could not have landed the way Hernandez describes, and instead must have landed with his hands out in front of him. R. 406-3, Pl.'s Exh. C., Boylan Report at 15. All this evidence supports Holmes's argument that Johnson was unarmed and fell to the ground as an unarmed person with his hands out in front.

The parties dispute almost every aspect of the gun's recovery, and the handling of the evidence in this case, including the gun and a bullet casing allegedly recovered from the backseat of Benton's car. DSOF ¶¶ 52–57; PSOAF ¶¶ 24–37. Holmes's theory of the case is that Hernandez and other CPD officers destroyed evidence that Johnson was unarmed, and fabricated evidence to show that he was armed. Compl. ¶¶ 22–26. Hernandez and the City of course deny the accusation. Defs.' Mot. 16–19. This dispute will be discussed further in the Analysis section, below.

17

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

Hernandez and the City argue that the undisputed, admissible evidence shows that Hernandez did not use excessive force when he shot Johnson. Defs.' Mot. at 1. At the least, they contend that Hernandez is entitled to qualified immunity for his

actions. *Id*. But several key factual disputes preclude summary judgment for the Defendants on either theory. It makes sense to engage in the two-step qualified immunity analysis, because this will necessarily encompass the merits question.

## A. Qualified Immunity

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Under qualified immunity, government officials are shielded from civil liability so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Zimmerman v. Doran*, 807 F.3d 178 (7th Cir. 2015) (cleaned up).[12] To defeat qualified immunity, a plaintiff must establish both that (1) the defendant violated a constitutional right and (2) the right was "clearly established," *Pearson*, 555 U.S. at 232, both "at the time and under the circumstances presented," *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016). A right is "clearly established" if the conduct is so clearly prohibited that every "reasonable official would [have understood] that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

---

[12]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

It is not exactly correct, as Holmes argues, that disputes of material fact in a Fourth Amendment excessive force case automatically preclude the possibility of qualified immunity. R. 407, Pl.'s Resp. at 30. But it is true that disputes of material fact may preclude qualified immunity, when reading the facts in the light most favorable to the plaintiff leads to the conclusion that a reasonable jury could find that the defendant violated a clearly established right. This is such a case.

### 1. Excessive Force

Whether the force used by police officers complies with the Fourth Amendment turns on whether "the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (cleaned up). That assessment is made from the "perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Burton v. City of Zion*, 901 F.3d 772, 777 (7th Cir. 2018) (cleaned up). Courts must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (cleaned up). The Fourth Amendment authorizes an officer to use deadly force when there is probable cause to believe that a suspect poses a threat of serious harm to others. *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985). When an officer reasonably believes that a suspect's actions place the officer or others "in the immediate vicinity in imminent

danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Horton v. Pobjecky*, 883 F.3d 941, 949 (7th Cir. 2018) (cleaned up). In most circumstances, an officer may use deadly force when the officer reasonably believes that a suspect "committed a felony involving the threat of deadly force, was armed with a deadly weapon, and was likely to pose a danger of serious harm to others if not immediately apprehended." *Id.* (cleaned up). An officer may use deadly force on even a fleeing suspect who poses such a danger, though the officer must give a warning if possible. *Garner*, 471 U.S. at 11.

In excessive-force cases where the victim of the allegedly excessive force died, the Seventh Circuit cautions against summary judgment. *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010). The evidence in these cases is typically open to different interpretations, and the plaintiff faces a special challenge because "the witness most likely to contradict the officer's testimony—the victim—cannot testify." *Id.* In any event, like any other non-movant facing a summary judgment motion, Johnson is entitled to all reasonable inferences in his favor. *Matsushita*, 475 U.S. at 587.

With this standard in mind, it is time to return to the facts of this case, viewing them in the light most favorable to Holmes and drawing reasonable inferences in her favor. The parties seem to agree that if Johnson was armed as he ran towards the park, then Hernandez was justified in shooting him. Pl.'s Resp. at 1, 21; Defs.' Reply

at 1.[13] Indeed, even if Johnson was *not* armed, if Hernandez had probable cause to believe him to be armed, thus posing a serious danger to others, then the shooting would have been justified (or at least subject to qualified immunity). The question, then, is whether Holmes has established a dispute of material fact about whether Hernandez had probable cause to believe Johnson to be armed and dangerous.

As an initial matter, it is necessary to clarify the standard the Court uses in evaluating what the Defendants label (adopting a reference in an opinion) as "negative testimony." Defs.' Reply at 5. The Defendants argue that so-called negative testimony—testimony about not seeing or not hearing something—cannot be used to create disputes of material fact. *Id.* at 4–6. Sometimes that is right—but sometimes not. It is true that if a person testifies that he did not see something, and the undisputed facts show that he had no way to observe it, then the testimony of non-observation is of little to no value. *Ybarra v. City of Chicago*, 946 F.3d 975, 980 (7th Cir. 2020). So if someone was 20 blocks away from Washington Park and said that he did not see Johnson holding a gun, then that person's observation (if it can even be called that) has zero evidentiary weight in establishing a genuine dispute on whether Johnson was armed. But the converse is also true: if a witness *was* in a position to see or hear something, and did not, then their testimony of not-seeing or not-hearing can be treated as testimony that the thing to be seen did not exist to be seen, or the thing to

---

[13]There is a subtler point to be made here. If Johnson was armed, but Hernandez had no probable cause to believe him to be armed, the shooting would likely not have been justified. (Imagine an entirely hidden weapon, never drawn, and a peacefully fleeing Johnson.) But the Plaintiff does not make this argument, so the Court will not develop it.

be heard did not exist to be heard. *See Ybarra*, 946 F.3d at 980 (explaining that testimony that car passengers did not hear police officers' warnings failed to present issue of material fact only "[t]o the extent that the passengers … could not hear the warnings"); *Kessinger v. Grefco, Inc.*, 875 F.2d 153, 157 (7th Cir. 1989) ("negative evidence is admissible if probative and … such evidence is probative if the attitude of attention of the witness who offers negative testimony [is] such that he would perceive the warnings in the event that one is given" (cleaned up)). Much (though not all) of the so-called negative evidence cited by Holmes falls into the category of reliable evidence that something really did not happen.

### a. Did Johnson Have a Gun?

Viewing the evidence in Holmes's favor, a reasonable jury could find that Johnson was unarmed on the night of the shooting. The key witness on this point—though not the only witness—is Reginald Benton. Benton gave a detailed description of Johnson running towards him, and said he saw nothing in Johnson's hands. Benton Dep. 104:13–06:12. All he saw Johnson doing, was running. *Id.* 116:20–17:1. Benton had a good vantage point to see Johnson: he was standing next to Officers Monte and Hooper on King Drive as Johnson came running around the corner towards them, and Johnson passed within three or four feet of Benton. Benton Dep. 59:18–21, 108:18–21.[14] This means that he was close enough to Johnson that if Johnson had had a gun, one would expect Benton to have seen it. So when Benton says he did not

---

[14]*See* footnote 5, *supra*.

see a gun, a reasonable jury could conclude that there was no gun to be seen. His testimony thus creates the genuine dispute of material fact that Holmes needs on this point.

The defense resists Benton's testimony by pointing to parts of Benton's deposition in which, responding to repeated questioning, he acknowledged that he could not say for *certain* whether Johnson was armed. Defs.' Reply at 20–21; Benton Dep. 105:24–06:10. Given that events unfolded quickly and in darkness, Benton's uncertainty makes sense. Benton's lack of 100% epistemological certainty does not change his testimony that he did not see a gun, despite standing close to Monte and Hooper. The weight and credibility of Benton's deposition testimony cannot be resolved at summary judgment—only a jury can do that.

And Benton was not the only one who did not see a gun in Johnson's hand, despite being in a position to see one if Johnson was armed. Officer Gilliana's testimony also supports Holmes's position. She was the officer who chased Johnson around the corner and came on the radio to announce she was in pursuit. Zone 5 Radio 6:43–6:51. Her radio report did not say that Johnson was armed. *Id.* At one point, Johnson was coming towards her and she could clearly see his face, clothing, shoulders, and chest. Gilliana Dep. 55:4–22. He was only about a "car length" away, an estimated 10 feet. *Id.* 52:9–15. And yet Gilliana testified that she could not see his hands and did not see a gun. *Id.* 52:23–53:1, 53:21–23. The defense argues that Gilliana's testimony cannot be interpreted in Holmes's favor because she said she did not see his hands. Def. Reply at 11. But the defense is forgetting to view the facts in the

24

light most favorable to Holmes. In her deposition, Gilliana accurately remembered what Johnson was wearing, testified that she could see almost the entire rest of his body, and acknowledged that based on her training and experience, she should have looked at his hands right away to check for a weapon. Gilliana Dep. 52:23–53:23. That she somehow missed the sight of a gun in Johnson's hand, despite her vantage point and training, need not be accepted by the jury. At the very least, a jury could reasonably find that if a police officer chasing a suspect on foot saw no gun when the two came face to face, mere seconds before Hernandez allegedly saw a gun, that suspect had no gun.

Gilliana is not even the only CPD Officer who did not see a gun—there is also Calvin. Calvin Dep. 58:14–59:15, 65:24–68:5, 68:11–21, 70:24–71:6. The defense objects to her testimony because she could not see Johnson's hands at all times, and she testified that she thought Johnson moved like someone with a gun. Def. Reply at 7–8. But this is another failure to view the facts in the light most favorable to Holmes. A reasonable jury could conclude that if Calvin, from her vantage point at the dash-cam car, did not see a gun, then there was no gun.

Marquise Price has also testified that he did not see a gun in Johnson's hand. Price Dep. 109:22–110:15. He recalled Ronald Johnson hitting the ground trying to show his hands were empty. *Id* 25:1–18. Like Benton, he described Johnson just running, with nothing in his hands. *Id.* 25:1–18, 110:1–12. To be sure, Price thinks that he was about 50 feet away from the spot where Johnson fell and was cuffed. *Id.* 36:4–6. But it will be up to the jury to determine the credibility of his testimony. The

defense also objects to Price's testimony on the grounds that it is contradicted by the dash-cam video. Def. Reply at 18–20. As discussed earlier, however, the Court disagrees. Johnson disappears from the frame as he is shot. It is not implausible that Price saw his hands go up in that moment. The defense also objects that Price could not see Johnson's hands at all times during the flight. *Id.* at 18–19. But that does not matter if Price can testify that he saw Johnson's hands up and empty as he was shot. The Plaintiff can rely on Price's testimony at this stage (though it is not really necessary, given Benton and Gilliana).

As further support for the proposition that Johnson was unarmed, Holmes points to the expert testimony of Dr. Laura Boylan. PSOAF ¶ 44. Dr. Boylan, a neurology expert, concluded to a reasonable degree of medical certainty that Johnson could not have fallen as Hernandez said he fell. Boylan Report at 15. She concluded that Johnson must have fallen with his hands out in front of him, palms down. *Id.* This is consistent with the witnesses who said they saw Johnson falling with his hands over his head or that he landed with his hands in front, and it is inconsistent with him falling with a gun in his hand at his side. The defense purports to raise an objection to Boylan's expert opinion under Federal Rule of Evidence 702. Defs.' Resp to PSOAF ¶ 44. But the defense has failed to develop this objection in the briefing, so it is forfeited at this stage. Boylan's report can be considered for purposes of the summary judgment motion, and it supports Holmes.

Last, but certainly not least, the dash-cam footage of Hernandez shooting Johnson does not completely support Hernandez's version of events. If there is no way

to definitely conclude from the video that Johnson was *unarmed*, the video also does not show that Johnson *was* armed. It is worth noting that in Hernandez's first version of the evening's events, he asserted that Johnson turned around while running and waved or pointed a gun at him. PSOAF ¶¶ 47–48. The dash-cam video shows no such thing. Hernandez later changed his story to one that could square with the footage: that he saw Johnson shift the gun's position in his hand and thought he might shoot. *Id.*; Hernandez Dep. 94:3–14. Viewing the footage, however, the principal impression it gives is of Johnson flat-out running away from Hernandez. It will be up to a jury to view the footage for itself, hear the rest of the evidence, and decide if Hernandez's story of Johnson changing the position of the gun allegedly in his hand is credible.

The defense also cites circumstantial and forensic evidence linking the gun allegedly recovered from the scene to Johnson. Defs.' Mot. at 5–6; DSOF ¶¶ 54–57. But none of this evidence is dispositive. The evidence relies on inferences to connect the gun to Johnson—inferences that a jury can reject, when viewed in the light most favorable to Holmes. All Holmes needed to do at this stage was establish a genuine dispute of material fact on whether Johnson had a gun in his hand as he ran from the police and fell to the ground. She has done that.

### b. Probable Cause to Believe Johnson Was Armed

But it is not enough for Holmes to create a dispute of material fact on whether Johnson was in fact armed—the next question is whether Hernandez had probable cause to *believe* that Johnson was armed. Even if Johnson was unarmed, if Hernandez had probable cause to believe that he was armed and dangerous to bystanders and

police, case law would likely authorize Hernandez to use deadly force (or at least confer qualified immunity on the officer). To the Defendants' way of thinking, several circumstances leading up to the shooting gave Hernandez probable cause to believe Johnson to be dangerous: the radio reports of shots fired and suspects running; other officers shouting that Johnson had a gun; the physical struggle Hernandez says he saw between Johnson, Monte, and Hooper; and Hernandez's belief that Johnson was running towards other officers and bystanders. The Court examines these circumstances one by one.

### i. Radio Reports

The police-radio reports do not, on their own, establish probable cause to shoot Johnson. It bears repeating that none of the radio call-outs that Hernandez heard said that an officer was in pursuit of a suspect armed with a weapon. PSOAF ¶ 3. There were reports of shots fired, and reports of suspects fleeing. Only one report described the shooters, and that only minimally, identifying them as "male blacks" wearing dark clothing. DSOF ¶ 10; Zone 5 Radio 2:30–47. Viewing the facts in the light most favorable to Holmes, Johnson was an unarmed Black man wearing a dark sweatshirt and light pants, running away from the police. In those circumstances, it is not reasonable for an officer to just shoot any Black man dressed in dark clothing on sight, even if it is late at night and the man is running away, simply because a report of an armed Black man in dark clothing has come over the radio. The description is too general and vague, and would authorize shooting way too many innocent people.

28

### ii. Shouts of a Gun

On whether officers shouted that Johnson had a gun, that is a genuinely disputed fact. Two officers who were in a position to have heard shouted warnings of a gun have testified that they did not hear them. That creates the disputed fact that Holmes needs on this point.

Officers Arif-Abraham and Calvin did not hear any officer tell Johnson to drop a gun, despite their location at the dash-cam car, across the street from the alleged scuffle with Monte and Hooper and just two or three car-lengths away from where Hernandez shot Johnson (their view being comparable to the view of the dashboard camera on their car). PSOAF ¶ 14; Dash Cam 1:11:50–1:11:55. From this distance, with Arif-Abraham outside the car, and Calvin with her window down, one would expect them to have heard warning shouts about a gun. The defense has not presented any argument to the contrary. Indeed, Calvin says that from inside her car, she *did* hear Monte and Hooper yell at Johnson to put his hands up, which makes it even more significant that she heard no shouts about a gun. Calvin Dep. 56:15–21.

Holmes also tries to rely on the testimony of bystander Davonte Atwood, who testified that he never heard anybody yell to drop the gun, but his testimony is not reliable given the foundation problems discussed earlier (namely, that he testified that he was located at an intersection that simply does not exist). D. Atwood Dep.,

19:6–22.[15] Arif-Abraham and Calvin together create the necessary dispute over whether anyone yelled that Johnson had a gun.

### iii. Encounter with Hooper and Monte

Whether Johnson demonstrated that he was a threat by fighting with Hooper and Monte is also a disputed fact. If Hernandez saw Johnson physically fighting Monte and Hooper, that might have been enough evidence (though it is far from certain) that Johnson was dangerous enough to justify the use of deadly force. The Defendants assert that Hooper and Monte tried to grab and stop Johnson, who physically struggled against them. DSOF ¶ 23. They say that Hernandez saw this happen. *Id.* In this version of events, Hernandez saw Johnson become "combative," hunching with his hand close to his body, and struggling to free himself from Hooper's grasp. *Id.* ¶ 24. Hernandez saw Johnson "flailing his arms and securing something close to his body." *Id.* Hernandez could not see Johnson's hands during this encounter. Hernandez Dep. 76:18–22, 77:11–14. The Defendants assert that during this struggle, Johnson raised his hands to his chest and at that point Hooper saw a dull metal object in his hands which Hooper believed was a gun. DSOF ¶ 25. Hooper fell to the ground, freeing Johnson's right hand. *Id.* ¶ 26. When Hooper fell, Hernandez saw the frame of a black handgun in Johnson's right hand. DSOF ¶ 27; Hernandez Dep 79:20–21. At this point Hernandez heard Gonzalez yell, "Gun. Gun. Gun." DSOF ¶ 28; Hernandez Dep 79:24–80:4. In the defense version of the facts, after the scuffle between

---

[15]*See* footnote 7, supra.

Johnson, Monte and Hooper, Monte started to chase Johnson, saw a gun in Johnson's hand and called "gun." DSOF ¶ 31. (It is worth noting, however, that Monte did *not* draw his own gun. PSOAF ¶ 10.) But Hernandez did *not* testify to having heard Monte yell that Johnson had a gun, so the defense cannot rely on this fact in support of its assertion that Hernandez had probable cause to shoot. And although Monte's alleged observation of the gun provides more evidence to support the account that Johnson had a gun, there is other evidence in the record to dispute that assertion.

Specifically, at this stage the Court *must* view the facts in the light most favorable to Holmes. Once again, Benton is a key witness. Benton, who was standing *with Monte and Hooper*, testified that Johnson never made physical contact with the group, and no violent struggle occurred. Benton Dep. 108:14–09:8. If the struggle really happened, Benton would have seen it. Benton's credibility is a question for the jury. Plus, neither Arif-Abraham nor Calvin saw the struggle take place. Arif-Abraham Dep. 34:2–11, 35:21–36:3; Calvin Dep. 60:17–24. The defense does not present an argument to rebut the Plaintiff's reliance on their testimony for the proposition that Johnson did not fight with Monte and Hooper—the defense's objections to Arif-Abraham and Calvin focus instead on refuting that their testimony can be used to infer that Johnson was unarmed. Defs.' Reply at 7–10. A jury could reasonably conclude that if there really was a fight happening with officers and a suspect on the street, then Arif-Abraham and Calvin would have seen it. But Arif-Abraham and

Calvin are not even necessary to create the dispute of material fact—Benton alone accomplishes that.[16]

### iv. Persons in Flight Path

The defense also asserts that Hernandez believed that Johnson could pose a threat to others because Johnson was running towards a public park and there were officers and bystanders around. DSOF ¶¶ 37, 41. As an initial matter, if Johnson was unarmed and fleeing peacefully as Holmes asserts, then it would not be reasonable to consider him a threat to others in the vicinity. But in any case, Holmes asserts that there were no police or bystanders in Johnson's flight path. PSOAF ¶ 16. To support this proposition, she cites the deposition testimony of Officer Arif-Abraham, who was positioned at the dash-cam vehicle with a good view of Johnson's flight. Arif-Abraham 62:4–11. (Holmes also cites the dash-cam footage, although this is less helpful because, as already mentioned, Johnson runs out of frame as he is shot, which means the video does not show the area towards which he was running.) The defense, on the other hand, points to the fact that Washington Park is a public park, DSOF ¶ 32—but public parks are not always populated, especially not after midnight. The defense further notes that other officers were present or arriving on the scene, DSOF ¶ 37, which nobody disputes, but Holmes asserts that Johnson was running *away* from all those officers, and that is also what the dash-cam video shows. Dash Cam, 1:11:52–

---

[16]Holmes also cites Davonte Atwood's deposition to support the proposition that Johnson made no contact with Hooper and Monte. PSOAF ¶ 8. The Court does not rely on Atwood's testimony for the reasons discussed in footnote 7, *supra*.

1:12:00. Viewing the facts in the light most favorable to Holmes, Johnson was unarmed and running *away* from everyone that Hernandez could see.

To the extent that the defense contends that the act of running alone showed Johnson to be dangerous, the Court rejects this argument. There are many reasons why someone who poses no immediate danger to others, and has no plans to cause serious harm to anyone, might still run away from police officers. Maybe he is carrying contraband and does not want to be caught. Or has suffered from excessive force in the past. Or he is just panicking. These are not reasons for someone to lose a life. As the Seventh Circuit explained: "We permit deadly force to be used against violent fleeing felons in part because they have forfeited the right to a less intrusive seizure by their actions. Fleeing felons who have not resorted to violence are accorded less intrusive seizures." *Est. of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993). As explained earlier, when viewed in the light most favorable to Johnson, he had not fought with police and was not armed. On those facts, he was entitled to less intrusive measures than the deadly force that Hernandez wielded against him.

Under Holmes's version of the facts, as supported by record evidence, Hernandez did not have probable cause to shoot Johnson. He is therefore not entitled to summary judgment on the merits of Holmes's excessive force claim. Now it is time to move on to the second part of the qualified immunity analysis.

### 2. Clearly Established

Having already discussed how the facts, when read in Holmes's favor, could allow a jury to find that Hernandez violated Johnson's Fourth Amendment rights,

33

the Court turns to the question of whether those rights were clearly established at the time of the shooting, that is, whether a reasonable officer would have known that he was using excessive force in this factual setting.

To show that a right is "clearly established," Holmes must either produce a "clearly analogous case establishing the right to be free from the conduct at issue," or show that even without an analogous case, Hernandez's conduct was "so egregious that no reasonable person could have believed that it would not violate established rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 508 (7th Cir. 2015). In this case, again viewing the facts in the light most favorable to Holmes, she has met her burden.

Remember that in Holmes's version of events (as supported by record evidence), which the Court must credit at this stage, Johnson was an *unarmed* man in flight. He had already encountered several police officers—Gilliana, Monte, and Hooper—without attacking or engaging any of them. He was just running away. And again, in Holmes's version, nobody had yelled anything about a gun. A fleeing, unarmed man is not a danger to officers or bystanders, even if he is a suspected felon. As the Supreme Court explained in *Garner*, sometimes officers must let felony suspects escape rather than resort to deadly force:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.

34

471 U.S. at 11. *Garner* was decided in 1985. Its principles are widely understood to be part of the bedrock of modern Fourth Amendment jurisprudence. Between 1985 and 2014, when the events underlying this case took place, the Seventh Circuit decided at least two cases that bring *Garner*'s point home. Although their facts are not exactly on all fours with the facts in this case, they are close enough to clearly illustrate the limits on officers' use of deadly force.

*Ellis v. Wynalda* illustrates how even odd behavior by suspected felons in flight does not justify deadly force if the suspect is unarmed and not dangerous. 999 F.2d 243 (7th Cir. 1993). An officer responded to a reported burglary and spotted the burglary suspect walking away from the scene, carrying a mesh bag of stolen money and goods. *Id.* at 245. When the officer told the suspect to stop, the suspect turned towards the officer, tossed his bag of loot at him, and started running. *Id.* The bag hit the officer on the shoulder, the officer yelled once at Ellis to stop, and then the officer shot him in the back. *Id.* The Seventh Circuit held that the officer was not entitled to qualified immunity, because viewed in the light most favorable to the plaintiff, there was no reason to think the suspect was armed and a threat. *Id.* at 247. And this suspect had thrown an object at a police officer—an object, moreover, that essentially framed him as the burglar. Johnson, by contrast, was just running. If an officer cannot shoot a fleeing suspect who disobeys police orders, throws a bag at an officer, and turns to run, then an officer certainly cannot shoot a fleeing suspect who is only running, without presenting any physical threat.

35

*Estate of Starks v. Enyart* further highlights how concrete the threat of danger from the fleeing felon must be to justify the use of deadly force. 5 F.3d 230 (7th Cir. 1993). When officers tried to arrest Starks for car theft, Starks tried to flee in the stolen car. *Id.* at 232. One of the officers jumped in front of the car and all three officers opened fire and killed the suspect. *Id.* The parties disputed whether the driver drove towards the officer in front of his car on purpose, or if the officer jumped in front of the car and created the danger himself. *Id.* Taking the plaintiff's version of the facts as true, the Seventh Circuit concluded that if the officer jumped in front of the car, then Starks was not intentionally putting that officer in danger, and the use of deadly force against him was unwarranted. *Id.* at 234. This conclusion is particularly striking because the decedent was fleeing *in a stolen car*, and flight in a car in those circumstances would inherently pose a risk of harm to bystanders. A driver fleeing from the police is likely to drive recklessly, and that is even more the case when the driver is taking off in the very fruits of a crime. A lone man on foot without a weapon poses no such threat. If officers are expected to allow a suspected car thief, who is otherwise unarmed and unthreatening, to flee in a stolen car rather than seize him with deadly force, the same must surely apply to an unarmed suspected felon fleeing on foot.

After *Garner*, and with the decades-old examples of *Starks* and *Ellis*, no reasonable officer could think that the Fourth Amendment allows him to shoot an unarmed man who has committed no violence and is running away from police officers—even if the man is a suspected felon. In this case, the evidence to consider Johnson a

36

suspected felon was itself thin, consisting only of his appearance matching a generic description that came over the radio, and the fact that he was running.

### B. State Law Claims

The defense has also asked for summary judgment on Holmes's state law claims. The Defendants argue that the state law claims should fail on the same grounds as the Fourth Amendment claims. Defs.' Mot. 24–25. For the most part, the defense does not make any independent arguments for why the claims for battery, wrongful death, survival action, and Family Expense Act should fail. The Court thus need not pass independent judgment on those claims. If Holmes's Fourth Amendment claim survives (as it does), then so do her state law claims.

The defense argues for Hernandez to be protected from liability on the battery claim under Illinois's Tort Immunity Act. Defs.' Mot. at 24. But again, it is not really an independent argument so much as saying that for the same reason Holmes's federal law claims fail, Hernandez should receive immunity under the Act. *Id.* The Tort Immunity Act states: "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. A jury could find that an act or omission that violates an individual's Fourth Amendment rights contrary to clearly established law also counts as willful and wanton conduct. *See Ybarra*, 946 F.3d at 981 n.1. In light of the holding on qualified immunity, the Tort Immunity Act does not shield Hernandez at this stage.

The City has not made any arguments to dismiss Count 7, for indemnification on the Fourth Amendment claim, Compl. ¶¶ 70–74, or Count 8, for respondeat superior on the state law claims, Compl. ¶¶ 75–77, except that they should be dismissed with the underlying substantive claims. Because the substantive claims survive, so do the indemnification and respondeat superior claims. The City's motion for summary judgment on those two claims is denied.

## IV. Conclusion

The Defendants' joint motion for summary judgment is denied. With the motion denied, the parties shall engage in settlement negotiations. On or before October 5, 2021, the parties shall file a joint status reporting on the negotiations and proposing the next step of the litigation (for example, entry of a settlement referral or scheduling a trial date).

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 17, 2021